Filed 12/8/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S118384 |
| v. | ) | |
| | ) | |
| ANGELO MICHAEL MELENDEZ, | ) | |
| | ) | San Joaquin County |
| Defendant and Appellant. | ) | Super. Ct. No. SP081070B |
| _____ | ) | |

A jury convicted defendant, Angelo Michael Melendez, of the first degree murder of Koi Wilson under the special circumstance of murder in the commission of robbery, of the attempted premeditated murder of Ricky Richardson, and of first degree residential robbery. It also found true personal firearm-use allegations. After a penalty trial, the jury returned a verdict of death. The court denied the automatic motion to modify the verdict and imposed a judgment of death. This appeal is automatic. We affirm the judgment.

## I. THE FACTS

### A. Guilt Phase

#### 1. Overview

During the night of December 12-13, 2000, defendant and LaTroy Taylor entered the Stockton home of Ricky Richardson and Koi Wilson. Within a few minutes, Wilson was fatally shot, Richardson was shot and seriously wounded, and money and marijuana were taken from the house. At a joint trial, the

1

prosecution theory was that defendant and Taylor committed the robbery together and, based largely on Richardson's testimony, that defendant alone shot the two victims. Defendant admitted he was present during the robbery, but he claimed Taylor was the shooter, and he did not know that Taylor intended to commit a robbery.[1]

### 2. *Prosecution Evidence*

Ricky Richardson was the only surviving eyewitness to the events in the house that night other than the defendants themselves. He testified that he is a rap artist who made and marketed compact discs. He wrote his own lyrics. He also sold marijuana and had a part-time job. Koi Wilson was his fiancé and the mother of their infant daughter. He and LaTroy Taylor were good friends and saw each other on a regular basis. Richardson had known defendant since he was four or five years old. Defendant was more than 20 years older than Richardson and had been a friend of Richardson's father. Richardson called defendant "Uncle Angelo."

Richardson and Wilson were at their Stockton home the evening of December 12, 2000. Their baby was sleeping in a back bedroom. At some point, Taylor came to the house. Richardson was not surprised to see Taylor, and he opened the front door to let him in. As he did so, to his surprise, he also saw defendant outside. Richardson let both of them in the house. Defendant asked to use the bathroom and went inside the bathroom. Richardson and Taylor went into the den, where Taylor asked for some marijuana. Wilson was sitting on a couch. Richardson also sat down, with Wilson sitting between Richardson and Taylor.

---

[1] The jury acquitted Taylor of murder and attempted murder but convicted him of robbery. He is not involved in this appeal.

Richardson and Taylor smoked some marijuana. Richardson saw that Taylor had a gun, but that did not surprise him because Taylor often carried a gun.

Defendant came out of the bathroom and asked Taylor whether he had gotten "what he came for." Defendant then shot Richardson in the abdomen, causing him to "fl[y] back on the couch." Richardson saw defendant point a smoking gun at him. Wilson started screaming, and defendant shot her twice. Richardson heard a total of three shots.

Richardson pretended to be dead because he feared he might be shot again. But he was able to perceive Taylor taking items from the house. He heard activity in the back bedroom and the baby crying. Later, Richardson heard activity outside and was able to observe Taylor and what appeared to be another person rolling out two safes. Defendant was still pointing the gun in the den.

At one point, Richardson heard Taylor tell defendant, " 'Make sure they dead.' " Defendant responded, " 'Oh, yeah. They dead.' " About three to five minutes after the first shot, Taylor and defendant left. Richardson heard a car driving away. He immediately called 911 on his cellphone and told the dispatcher he had been shot. Police and other responders were dispatched at 1:08 a.m., December 13, 2000, and arrived within minutes.

Wilson was dead at the scene, having been shot twice through the chest. Richardson was shot once in the abdomen. He required emergency medical care, multiple surgeries, and a lengthy hospital stay to save his life. As of the time of trial, the bullet was still embedded in him, and he was paralyzed below the waist.

Police officers testified that the house appeared ransacked when they entered it. The baby was crying in the bedroom. Three .45-caliber Speer shell casings were found on the floor and two spent bullets were found under Wilson's body. Criminalists testified that the three casings came from the same gun. The two bullets had also been fired from the same gun, possibly a .45-caliber handgun.

3

Richardson testified that about $27,000 and four pounds of marijuana were taken from his home. Originally he had told the police about $20,000 had been taken, and he did not mention the marijuana. He did not want to admit to possessing the marijuana.

Richardson, who was in considerable pain at the time, told the original dispatcher that Taylor had shot him, although he also told her that defendant was present. He testified that at the time he was primarily interested in getting help for himself and Wilson, and he felt betrayed by Taylor. He believed that, but for Taylor, defendant would never have come to his house. He explained, "The reason I kept saying LaTroy was because I felt like he shot me . . . , because I trusted him. . . . [W]hen I woke up, I was still saying LaTroy because it was . . . just registered in my head that he was the one who set that up." Detective David Anderson, who investigated the case, spoke with Richardson briefly on December 19, 2000, in the hospital. At that time, Richardson said Taylor shot Wilson and defendant shot him. When Anderson next spoke with Richardson, on February 8, 2001, Richardson said defendant shot both of them. At trial, Richardson testified positively that defendant was the one who shot both him and Wilson. He also testified that he never saw Taylor pull out his gun.

After the shooting, Taylor traveled to St. Louis, Missouri, where he was arrested. Defendant was arrested in Seattle, Washington.

### 3. Defense Evidence

Defendant and the codefendant, Taylor, each presented evidence attempting to show that the other was the shooter.

#### a. Defendant's Evidence

On October 1, 2000, the police confiscated a .45-caliber handgun, loaded with Speer ammunition, from Taylor's possession. A criminalist testified that a

4

gun of that caliber and with similar ammunition fired the shots in this case. The criminalist also testified that, due to gunpowder particles found on Wilson's tank top, at least one of the shots was fired from within a few feet of her. No gunpowder was found on Richardson's clothes, suggesting he was shot from farther away. The criminalist also testified about the direction of the shots and opined that the shooter was in the same room as the victims or in the entryway.

Stockton Police Officer Eric Gauthreaux testified that he arrived at the scene of the shooting at 1:08 a.m., on December 13, 2000. Richardson told him that "LaTroy" had shot him and Wilson. Richardson also said that "Angelo was with LaTroy."

Tino Yarborough, defendant's nephew and a distant relative of Taylor's, testified that in the early morning hours of the night of the shooting, defendant came to his house. He let defendant inside, and defendant paced back and forth in Yarborough's bedroom. About 45 minutes to an hour later, Taylor arrived. He had a gun with a clip like a .45-caliber gun and a bag. Defendant went outside. A short time later, Yarborough saw defendant and Taylor "tussling" outside. Yarborough also saw money in Taylor's hand. He said that Taylor was trying to give defendant some money but defendant "hit the money out of his hand" and it fell to the ground. Defendant then went back into the house. Yarborough gave Taylor his cellphone and the keys to his car, and Taylor left.

Defendant testified. He said he was asleep the evening in question when Taylor called him on the telephone. Taylor said he wanted to speak with him about defendant's girlfriend. Taylor had called her a "bitch," and he indicated he wanted to discuss the situation with defendant. Defendant agreed to see him, and Taylor came to his house. Defendant got in the car and, with Taylor driving, they left. Eventually, they drove to Richardson's house. Defendant did not know where Richardson lived and was unaware it was his house. They entered the

5

house, with Taylor saying he wanted some marijuana. Richardson hugged defendant and called him "uncle."

Defendant asked to use the bathroom. While in the bathroom, he heard four to five gunshots. He opened the bathroom door and saw Taylor holding a pistol. He asked what was going on and ran out the door. He was "in shock and little bit [of] fear." He ran down the street, but then he returned, grabbed Taylor by the collar, and "slammed him" to the ground. He asked Taylor why he did these things. Taylor said, "They both dead." Defendant responded, "Who's both dead?" He punched Taylor and then asked him to take him home. They then drove away.

While driving, Taylor said it would be "all right" and offered to give defendant money. Defendant said he did not want any money. At his request, Taylor drove him to his sister's home, where Tino Yarborough lived. He "cussed" Taylor and hit him again. Then Taylor left. Later Taylor returned to Yarborough's house. Defendant went outside to "kick his ass." Taylor again offered defendant money. Saying he did not want any, defendant slapped the money out of Taylor's hand and onto the ground. Eventually, Taylor left.

Defendant stayed in Stockton for several days, then went to Seattle, where he was arrested. He had previously intended to go to Seattle. He testified that he did not report the incident to the police because Taylor's "Sutter Street gang members" had threatened him.

b. Taylor's Evidence

Taylor called as a witness Larry Rhodes, who had known defendant for about 40 years. On May 17, 2001, Rhodes spoke with Detective Anderson, the police investigator in this case, at Deuel Vocational Institute, where Rhodes was an inmate. Rhodes told Anderson that defendant had told him, " 'Yeah, I shot his

6

black ass,' " referring to Richardson. But Rhodes testified at trial that he had lied to Detective Anderson, and defendant did not say that. (When he testified, defendant also denied making the statement.) Detective Anderson testified that Rhodes had wanted an early discharge from custody in return for his testimony, but Anderson refused to make any offer. Taylor's investigator testified that Rhodes had told him that if he, Rhodes, were called to testify, he would say that the statement was a lie.

### B. Penalty Phase

#### 1. Prosecution Evidence

Koi Wilson's mother and sister testified about her and her death's impact on them. Additionally, the prosecution presented evidence of defendant's other violent crimes and felony convictions.

Christine P. and Yolanda D. testified about an incident in September 1980, when they were around 18 years old, in which defendant and Howard Gaines, armed with a shotgun and a rifle, took them to a field and then to Yolanda's apartment. In the apartment, Gaines raped Yolanda. Defendant tried to rape Christine, thrusting the shotgun under her throat and threatening to kill her in the process. But she successfully resisted, at one point inducing herself to vomit to discourage defendant. Defendant later threatened to kill Christine and her family after he got out of prison if she told anybody about what he had done.

Shortly after this incident, on September 19, 1980, defendant and Gaines assaulted two other young girls, Lynette D. and Adela J. When Adela testified, she claimed not to remember much of what had occurred. Accordingly, portions of her previous testimony were read into the record as prior inconsistent statements. She had testified that she, Lynette, Gaines, and defendant, went to a house in Sacramento. There, defendant demanded that Adela convince Lynette to

7

have sex with Gaines, and said that she was to hit Lynette if necessary. Adela observed Gaines hit Lynette in the face. She heard defendant say "that if they didn't kill her [Lynette], they would go to the state penitentiary for beating her up."

Defendant and Gaines then drove the girls to a cornfield. Defendant said they were going to kill Lynette. He had a knife, and he ordered Adela not to look or they would cut her throat. Gaines and defendant dragged Lynette, "crying and just screaming," away from the car. After a while, defendant returned, and then Gaines put Lynette back in the car. They drove to a house in Conway, where defendant obtained a gun. Defendant said he was going to shoot Lynette. When Adela started crying and pleading, he also threatened to shoot her in the head if she "didn't shut up." They drove to another location, where Gaines took Lynette out of the car. Defendant told Adela to "shut up . . . or I was going to get what she got." Adela then saw Gaines shoot Lynette. Lynette grabbed her stomach and fell to the ground, where Gaines shot her "again and again."

Lynette was shot once in the stomach and twice in the head, but she survived. She was in the hospital for 11 months, comatose much of that time. At the time of trial, some 23 years after the shooting, Lynette was in a "semi-coma," required care 24 hours a day, and was paralyzed from the neck down.

For this incident, defendant was convicted of assault with intent to commit murder, assault with a deadly weapon, and dissuading a witness.

Loretta Beck testified that on November 18, 1988, she was in a relationship with defendant. At trial, she claimed not to remember what happened that day, so her previous statements to the police were admitted as prior inconsistent statements. She had told the police that defendant hit her in the face with his fist, took her into the house, continued to hit her in the face, and choked her with his hands. At trial, she denied that defendant had hit her.

8

Raven Lee testified that on May 24, 1998, when defendant was her boyfriend, they quarreled. Defendant punched a hole in the wall of her house and, in the presence of her children, threatened to kill them all. He also grabbed her by the throat, inflicting visible marks.

In 1980, defendant was convicted of shooting into an inhabited dwelling. In 1992, he was convicted of grand theft from the person. In 1994, he was convicted of possession of cocaine.

### 2. Defense Evidence

Defendant's mother, two sisters, and a brother testified about his difficult childhood and good qualities. His daughter testified about her relationship with him and her love for him. Gwen Taylor testified about the help and good advice she received from defendant when she very much needed it. She had lived with him for a while, although she could not remember which years.

Dr. Sammunkan Surulinathan, a psychiatrist, testified that defendant voluntarily came to see him on December 11, 2000, complaining of depression and hearing voices. Defendant said he had "paranoid delusions of being watched and followed." He also said he liked to play with his nieces and nephews. Dr. Surulinathan prescribed Prozac for his depression, as well as an antipsychotic medication.

## II. DISCUSSION

### A. Prosecutor's Use of Peremptory Challenges

During jury selection, defendants objected that the prosecutor exercised peremptory challenges against three African-American prospective jurors for reasons of group bias in violation of their state and federal constitutional rights. (See *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.) The trial court found a prima facie case of discriminatory challenges but

9

denied the motion after the prosecutor explained his reasons for the challenges. Defendant contends the court erred. We disagree.

### 1. Factual Background

The prosecutor exercised three of his first 19 peremptory challenges against the only three African-American prospective jurors who had become available for challenge. After the third challenge, both defendants objected. One of defendant's attorneys noted that the most recent challenge was to "the third of three African-Americans who so far, out of the 90 or so people in the panels one and two, who have made it into the box. All three of the African-Americans have been struck." The court found defendants had made a prima facie showing that the challenges were improper and required the prosecutor to state his reasons for the challenges.

The prosecutor began by explaining that during the time between receipt of the completed juror questionnaires and voir dire, he had filled out a form for each prospective juror and rated them on a scale of 1 to 10 as possible jurors. He stated that he never looked at the question on the questionnaires that indicated race. He noted that before the jury selection process began, he had filed a motion arguing the questionnaires should not ask about the juror's race, but the court overruled the objection. He stated, "I pleaded with the Court through my motion not to have that question on there. I don't think it's relevant. . . . I don't care whether it's on there, so I paid no . . . mind to it." He stated that therefore "my evaluation of a juror is completely race neutral before I walk in the court and see their faces." He then stated his reasons for each of the three challenges at issue.

The prosecutor said that he had immediately rated the first of the three, D.W., "a no way, never will he ever sit on one of my juries." He stated several reasons. He explained that D.W. had been court-martialed while in the Navy. His

10

brother-in-law was serving six years in state prison, which D.W. did not think was fair. D.W. "believes that police officers gather in the hallway to corroborate their false stories before they testify, believes that judges presume guilt before anybody testifies, had negative comments about the District Attorney, had negative comments about the Public Defender. He believed that people who sold drugs got what they deserved. He believed that the District Attorney would have an increased burden in the guilt phase." The prosecutor gave specific examples from the questionnaire to support these statements. He added, "And then he said that he would not be able to follow the law in the penalty phase questions. And then he said he was afraid of jury retaliation on the juror. And then when he testified here, he gave some long-winded confusing stories which also indicated that he would not be a proper juror."

The prosecutor stated he had originally rated the second juror in question, S.C., a 5 on a scale of 1 to 10, but after listening to her, "I rated her a no way will she ever sit on one of my juries." He noted that she had been arrested for drugs and it was dismissed, and her brother and nephew were in state prison for robbery. "She doesn't read any newspapers or watch any news. I think it's important to have a juror who sits in a death penalty panel to be aware of his or her surroundings and their place in the community. A person who doesn't watch the news and doesn't read the newspaper has a limited view of their surroundings and has a limited connection with their community. She had absolutely no feelings on the death penalty. I would be requesting people to go in there and actually have feelings on the death penalty one way or the other. . . . I think when you don't have feelings about the death penalty — which I think is odd especially when you're 43 years old — that now is not the time to try to figure out where you stand, especially not when it's not one defendant but it's two defendants . . . . In addition, what knocked her from a five which is an extremely low score and

11

knocked her into the never going to be sitting on my jury list is her answers to [one of the defense attorneys] in which she was a witness in a 245 [assault]. And she said essentially that the police officers weren't telling the truth about what she said. And in this particular case there's going to be a lot of what the police officer said. In addition, her answers were — the way she delivered the answers were in a cavalier manner which indicates she was entirely bored with the system. . . . I need people who care. I need people who are going to see it the way through."

The prosecutor stated that he had originally rated the third juror in question, M.J., a 4 because "one, he had no opinion about anything. This is a 58-year-old man who was in the Marines." He gave specific examples about the lack of an opinion, then added, "And when I asked him . . . he gave exactly the same response he gave on the questionnaire, nothing. I can't have again a person deciding where they stand on the death penalty, where they stand on drug dealing, where they stand on rap artists, whether they can tell if somebody is telling the truth or not in the middle of my trial."

The prosecutor described another factor that concerned him about M.J.: "The other thing . . . is the fact that he's killed before. And I've only had one juror who said that before. And that was my last death penalty case. And that was a tank commander, and he had killed before. And he was the one juror who held the jury out the longest. And the reason he told me was because he had taken a life before, and now he's being put in the same position. And he hadn't realized it before he got on the jury, but that decision — because he had taken a life before, the decision to take a life again personally caused him great distress. So if [M.J.] was going to decide during the penalty phase where he stood on the issue of capital punishment and then in the background having taken at least one human life before — and he served in Vietnam from 1966 to 1968, and I assume he's

12

taken more than one life — then I think he would have grave reservations on whether he could impose the death penalty in this particular case."

In arguing the matter, counsel for defendant noted that the prosecutor did not ask M.J. any questions about taking a life which, he argued, showed "bad faith." The court responded by stating, "Actually he did." When the attorney for codefendant Taylor said, "It was me," the court replied, "Somebody did." Defendants also argued that the prosecutor had not challenged other allegedly similar non-African-American jurors. During this discussion, the court made clear that it had reviewed the relevant juror questionnaires. After the parties finished arguing the matter, the court denied the motion with an oral order.

The court began by stating that it had no "trouble" with the first two challenges, but it "had more of a problem with regard to [M.J.], and I was waiting to hear what [the prosecutor] said with regard to [M.J.]. But I'll have to say that after listening to him, he has me convinced, actually."

The court then discussed D.W., the first of the challenged jurors, and found "a perfectly good reason for using a challenge, and I don't think its inconsistent with the other challenges here. It is true that he did go through a court-martial when he was in the military. He does have relatives in prison, and he did express in the questionnaire a very negative attitude towards courts and lawyers as far as that goes. And nobody has been able to show me where the DA has passed over people or at least has had plenty of opportunity and passed over people like that at this point."

The court also discussed S.C., the second of the challenged jurors, and found her to be "an obvious exclusion situation because . . . I remember listening to her and seeing the way she said that the police tend to put words in your mouth or in her mouth anyway in regard to an incident that she observed. And it was obvious that she felt that the police are not to be trusted. She also has relatives in

13

state prison for felonies. And it is true that her comment about never watching any news whether it be in the newspaper or on TV is probably a good reason for excluding anybody."

The court then returned to the prosecutor's challenge to M.J., the one it was initially concerned about. The court said this prospective juror "was an absolutely neutral juror with regard to his questionnaire, and for that reason I really did have some question about his exclusion. However, it is true that probably a person who expresses no opinion whatsoever — and it is correct that his entire questionnaire he just kept writing over and over again no opinion. He just checked off boxes without ever writing anything down, which probably other people have done as well. But he really did leave an absolute blank page with regard to opinions.

"However, that is not the most important thing. And I have to say this is the first time I've heard this one, and it does have a certain ring of logic to it with regard to the fact he has taken human life before in combat. And . . . if somebody can show me the DA has passed over somebody else who has done that, I might be more convinced. But I do see the logic in why it may be a problem. Especially if that has been a problem before, I can kind of see why somebody that might have done that and then expresses no opinion — I can see it if the person had been in combat before and then made some comment about how they've adjusted to it, it might be different. But it is true after doing that he indicates no opinions at all about the effect on him or his ability to make a decision with regard to death or life in this case. So I have to say that that does tend to convince me. I think that that shows it is a nonprejudicial and neutral basis for exercising a challenge."

The court found all three challenges to be nondiscriminatory and, for that reason, denied the motion.

## 2. Applicable Legal Principles

The United States and California Constitutions prohibit exercising peremptory challenges based on race. When a defendant alleges discriminatory use of peremptory challenges, the defendant must first make a prima facie showing of impermissible challenges. If the trial court finds a prima facie case, the prosecutor must then state nondiscriminatory reasons for the challenges. At that point, the trial court must determine whether the reasons are credible and whether the defendant has shown purposeful discrimination under all of the relevant circumstances. The defendant has the ultimate burden of persuasion. (*People v. O'Malley* (2016) 62 Cal.4th 944, 974 (*O'Malley*).)

Here, the trial court found a prima facie case. In that situation, we must determine whether the trial court correctly ruled that the defense did not demonstrate discriminatory purpose at the third stage. The prosecutor's justification does not have to support a challenge for cause, and even a trivial reason, if genuine and race neutral, is sufficient. The inquiry is focused on whether the proffered neutral reasons are subjectively *genuine*, not on how objectively reasonable they are. The reasons need only be sincere and nondiscriminatory. We review the trial court's determination with restraint, presume the prosecutor has exercised the challenges in a constitutional manner, and defer to the trial court's ability to distinguish genuine reasons from sham excuses. When the trial court makes a sincere and reasoned effort to evaluate the prosecutor's reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them. (*O'Malley*, *supra*, 62 Cal.4th at p. 975; *People v. Lenix* (2008) 44 Cal.4th 602, 613.)

At this stage, a defendant may engage in "comparative juror analysis"; that is, may compare the responses of the challenged jurors with those of similar unchallenged jurors who were not members of the challenged jurors' racial group.

15

Such analysis is not necessarily dispositive, but it is one form of relevant circumstantial evidence. When comparative juror arguments are made for the first time on appeal, as to some extent in this case, the prosecutor was not asked to explain, and therefore generally did not explain, the reasons for not challenging other jurors. In that situation, the reviewing court must keep in mind that exploring the question at trial might have shown that the jurors were not really comparable. Accordingly, we consider such evidence in light of the deference due to the trial court's ultimate finding of no discriminatory purpose. (*O'Malley*, *supra*, 62 Cal.4th at pp. 975-976.)

### 3. Application to This Case

Defendant asserts that the trial court made "nothing more than a perfunctory review of the prosecutor's stated reasons," and that, for this reason, the court's findings are not entitled to deference. The record is to the contrary. The court considered the prosecutor's reasons very carefully and made a sincere and reasoned effort to evaluate them. Accordingly, we defer to its conclusions. (*People v. Williams* (2013) 58 Cal.4th 197, 281.)

Defendant also argues the court erred as to all three prospective jurors at issue when it found genuine, race-neutral reasons for the challenges. He stresses that the prosecutor challenged African-Americans at a rate far higher than their percentage in the overall jury pool; indeed, he challenged all three African-American jurors who were available for challenge. These circumstances certainly justify the trial court's finding of a prima facie case. They also warrant close scrutiny of the prosecutor's proffered reasons, which the trial court undertook, and which we now review.

16

*a. D.W.*

D.W. stated on the jury questionnaire that he had been court-martialed while in the Navy.  He stated that his brother-in-law was serving six years "in jail," and he believed the criminal justice system had treated him unfairly.  Regarding criminal defense attorneys, he said, "If you know (gut feeling) if your client is guilty it seems they're in it for the money."  Regarding prosecutors, he said, "No need to badger or confuse witnesses just move on."  Regarding judges, he said, "I've seen two judges in action and one seems as if you are guilty before sentenced."  Regarding police, he said they "[t]alk in groups before court to get each other on track."  He stated he believed that anyone involved in marijuana sales "gets what they deserve."  Among his answers to penalty phase questions, he said he could not set aside his personal feelings regarding what the law ought to be and follow the law as the court explained it, "because I may have saw or felt something no one hasn't seen."  He said that in a death case, he would raise the prosecution's burden of proof to a standard other than reasonable doubt.  He also expressed concern about retaliation against a juror.

During voir dire, regarding whether he thought police officers were less truthful than others, D.W. said:  "Well, I mean, I haven't been on jury duty.  And I've seen just like real cases on TV basically, so I'm like watching TV.  And I've seen like basically three incidents where police officers that show taped — they didn't show what the police officers did, but they wound up lying on the stand.  So they're trying to like putting their facts together, you know, so you know what they're going to say.  So that's what I've seen."  He added that he did not mean that every police officer did that.  Regarding his concern about retaliation, he said, "I'm not really scared.  I just — I don't really want to be in a situation where things happen."  He also told some stories that could be described as long-winded and confused.

17

Contrary to defendant's arguments, this record supports the reasons the prosecutor gave for his challenge, and they are race neutral.

Defendant argues that the fact D.W. had a brother-in-law in state prison is not race neutral because more African-Americans have relatives in prison than members of other groups. He cites *Hernandez v. New York* (1991) 500 U.S. 352 (*Hernandez*). There, the group at issue was Latinos. (*Id*. at p. 355.) One reason the prosecutor gave for two of the challenges was that the prospective jurors were bilingual and, based on their responses and demeanor, he was concerned that they might have difficulty listening to and following the interpreter. (*Id*. at p. 356-357.) The defendant argued that this reason was not race neutral because many Latinos speak Spanish.

No opinion in *Hernandez* garnered majority support.[2] The plurality opinion found the prosecutor's reason to be race neutral. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." (*Hernandez*, *supra*, 500 U.S. at p. 360.) The plurality explained that the defendant argued "that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish. He points to the high correlation between Spanish-language ability and ethnicity in New York,

---

[2] Justice Kennedy authored the plurality opinion in *Hernandez*, *supra*, 500 U.S. 352, speaking for four members of the court. Justice O'Connor, speaking for herself and Justice Scalia, authored a concurring opinion. The concurring opinion agreed with the plurality that the prosecutor's reason was race neutral. (*Id*. at pp. 372-375.) All further references to the *Hernandez* opinion will be to the plurality opinion.

where the case was tried." (*Ibid*.)  It said it "need not address that argument here, for the prosecutor did not rely on language ability without more, but explained that the specific responses and the demeanor of the two individuals during *voir dire* caused him to doubt their ability to defer to the official translation of Spanish-language testimony." (*Ibid*.)

"The prosecutor here offered a race-neutral basis for these peremptory strikes.  As explained by the prosecutor, the challenges rested neither on the intention to exclude Latino or bilingual jurors, nor on stereotypical assumptions about Latinos or bilinguals.  The prosecutor's articulated basis for these challenges divided potential jurors into two classes:  those whose conduct during *voir dire* would persuade him they might have difficulty in accepting the translator's rendition of Spanish-language testimony and those potential jurors who gave no such reason for doubt.  Each category would include both Latinos and non-Latinos.  While the prosecution's criterion might well result in the disproportionate removal of prospective Latino jurors, that disproportionate impact does not turn the prosecutor's actions into a *per se* violation of the Equal Protection Clause." (*Hernandez*, *supra*, 500 U.S. at p. 361.)

In language defendant cites, the plurality did find that a disparate impact would be relevant to the overall inquiry.  "While the disproportionate impact on Latinos resulting from the prosecutor's criterion for excluding these jurors does not answer the race-neutrality inquiry, it does have relevance to the trial court's decision on this question.  '[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [classification] bears more heavily on one race than another.'  [Citation.]  If a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a

19

pretext for racial discrimination." (*Hernandez*, *supra*, 500 U.S. at p. 363.) "The trial judge can consider these and other factors when deciding whether a prosecutor intended to discriminate." (*Id.* at p. 364.) Ultimately, the plurality concluded that the "state courts came to the proper conclusion that the prosecutor offered a race-neutral basis for his exercise of peremptory challenges. The trial court did not commit clear error in choosing to believe the reasons given by the prosecutor." (*Id.* at p. 372.)

Under *Hernandez*, *supra*, 500 U.S. 352, defendant's argument that more African-Americans have relatives in prison than members of other groups, even if factually correct, does not establish that the criterion is not race neutral. However, as the *Hernandez* plurality explained, this circumstance is relevant to the inquiry as to whether the reasons were sincere and not merely pretextual.

Here, no reason appears for the trial court to find this reason was pretextual. The prosecutor did not excuse D.W. solely because he had a brother-in-law in prison, but also because he believed the criminal justice system had treated the brother-in-law unfairly. A "negative experience with law enforcement" is a valid basis for a peremptory challenge. (*People v. Montes* (2014) 58 Cal.4th 809, 855.) Moreover, the prosecutor cited many other race-neutral reasons for the challenges which the record supports and which the trial court credited. D.W. had been court-martialed in the Navy; he made critical comments about prosecutors, defense attorneys, and judges; he exhibited distrust of police; he said he could not follow the law as the court explained it; he said he would hold the prosecution to a higher standard than reasonable doubt. Each of these factors would justify the challenge. In combination, they do so strongly. (*People v. Salcido* (2008) 44 Cal.4th 93, 140 [life experiences, including court-martial, justify challenge].)

Defendant engages in comparative juror analysis regarding D.W. But, given the many valid reasons the prosecutor gave for challenging D.W., none of

20

the sitting jurors defendant cites were similar to D.W. for these purposes. "In order for a comparison to be probative, jurors need not be identical in all respects (*Miller-El v. Dretke* (2005) 545 U.S. 231, 247, fn. 6), but they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 107.) For example, defendant notes that some of the sitting jurors had relatives who were in prison or otherwise involved in the criminal justice system. But, unlike D.W., each of them had also stated the belief that the criminal justice system had treated the relatives fairly. D.W. said the opposite. These and other jurors defendant cites did not give overall responses remotely similar to the many responses the prosecutor cited for the challenge.

Defendant also argues the prosecutor did not question D.W. sufficiently for his reasons to be genuine. The prosecutor questioned him only briefly about his attitude towards someone who shoots a drug dealer. Although relevant, this factor is of little significance here, where the prosecutor had a detailed jury questionnaire to review and heard the attorneys for both defendants question D.W. at some length. (*People v. Dement* (2011) 53 Cal.4th 1, 20-21; *People v. Taylor* (2010) 48 Cal.4th 574, 615-616.) "Under these circumstances, we place little weight on the prosecutor's failure to individually or more thoroughly question a prospective juror before exercising a peremptory challenge." (*Dement*, at p. 21.)

> b. S.C.

S.C. stated on the jury questionnaire that she had been arrested or charged for "drugs," that the charge was dismissed, and that her brother and nephew were charged with and went to prison for robbery. She said she does not "read the paper or watch the news." She generally had no opinions or feelings regarding the death penalty.

21

During voir dire, she said that on one occasion she had to testify about a crime she had witnessed. She said the experience was "all right," but she added, "I just didn't like the fact that the officers put words into your mouth, you know, that you didn't say." On further questioning, she confirmed that the officers "put words into [her] mouth." She said the officer's statement was "totally different" than her testimony. She added that the experience had not left her with a distrust of police or the criminal justice system. In response to questions from the prosecutor, she reiterated that she had no feelings about the death penalty, and that she did not "read the paper" or "go on the Internet." She did not like the news.

Contrary to defendant's arguments, this record also supports the reasons the prosecutor gave for his challenge, and they are race neutral.

The trial court found S.C. to be "an obvious exclusion situation," primarily because of her statements about the police putting words into her mouth. It found it "obvious that she felt that the police are not to be trusted." Defendant quarrels with the court's finding on various grounds and notes S.C.'s statement that the experience did not make her distrust the police. But the court was present and observed her demeanor, which this court cannot do. "In assessing credibility, the court draws upon its contemporaneous observations of the voir dire." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) As part of this assessment, it considers the prospective juror's demeanor. (*Id*. at p. 614.) Additionally, and especially in combination with this concern, the facts that she had once had drug charges that were dismissed, and had close relatives in prison for robbery, were valid grounds for the challenge. Unlike D.W., this prospective juror did not express the belief that her relatives had been treated unfairly, thus making defendant's argument somewhat stronger that this reason was pretextual. (See *Hernandez*, *supra*, 500 U.S. at p. 363.) But, given the overall circumstances, this factor alone did not compel the court to find the reason a pretext. The prosecutor's concern that she

22

never read newspapers or watched the news, which the court also credited, were also race neutral. We have no basis to overturn the trial court's finding.

Defendant makes comparative juror analysis arguments. But, again, none of the other jurors he cites were at all similar to S.C. None, for example, exhibited distrust of police to the extent the trial court found S.C. did.

### c. M.J.

M.J. stated on the jury questionnaire that he had served as a Marine from 1966-1968, had experienced combat, and had taken human life. He had no opinions on several matters. During voir dire, in response to questions from the attorney for codefendant Taylor, he said he had had to take a human life in combat in Vietnam, but that the experience would not make him hesitate to serve as a juror in this case. In response to questions from the prosecutor, he reiterated that he had no opinions on the criminal justice system or the death penalty.

This record also supports the prosecutor's statement of reasons, and they are race neutral.

The trial court was initially concerned about this challenge because in some ways M.J. appeared to be a fine juror for the prosecution. The main reason the court cited in finding the challenge nondiscriminatory was the prosecutor's concern about M.J.'s having killed in Vietnam. The prosecutor explained that after a previous death penalty trial, a juror who had also killed before — and had "held the jury out the longest" — told him he had found it distressing to have to decide whether to take a life again. The juror had not realized this problem before he was on the jury. Because of this, the prosecutor was concerned that M.J. might similarly have difficulties imposing the death penalty. This explanation is unusual but credible. It is also race neutral. The court, who was able to observe the

23

prosecutor's demeanor, believed the explanation. We have no basis to overturn the court's finding that the reason was genuine and nonpretextual.

Additionally, the prosecutor expressed concern that M.J. seemed to have no opinions. The trial court also credited this reason, noting that this juror "really did leave an absolute blank page with regard to opinions." M.J.'s lack of opinions, or refusal to express them, was a valid, race-neutral reason for striking him.

Defendant argues that the prosecutor did not question M.J. about his having killed before. But a party need not question a prospective juror about every factor that might cause concern before exercising a peremptory challenge. (*People v. Dement*, *supra*, 53 Cal.4th at p. 21.) Additionally, as the trial court noted when the defense made the same argument at trial, one attorney did question M.J. about it. The prosecutor was not required to accept M.J.'s statement that his experience did not make him hesitate to serve as a juror in the case, especially since, as the prosecutor explained, the previous juror had not realized the problem until he was actually a deliberating juror. The prosecutor could reasonably believe that further questioning could not obviate his concern.

Defendant also engages in comparative juror analysis regarding M.J. He argues, for example, that some of the nonexcused jurors similarly expressed no opinions. But, as the trial court noted in rejecting the comparative juror analysis argument at trial, "if somebody can show me the DA has passed over somebody else who" had killed in combat, it might have been more convinced. M.J. was unique in this regard among the prospective jurors. Again, no reason appears to overturn the trial court's ruling.

In short, substantial evidence supports the trial court's determination that the prosecutor's stated reasons as to each of the challenges were genuine and race neutral. (*People v. Williams*, *supra*, 58 Cal.4th at pp. 284-285.) The court properly denied the motion.

**B. Exclusion of a Document**

Before trial, defendant filed a written motion to admit into evidence a single piece of paper containing handwriting that had apparently been found in Taylor's jail cell, and that the prosecution had provided to defendant in discovery. He contended that the handwriting was a rap song that Taylor had written "in which he claims to be the killer in this case." Taylor filed a written objection to admitting the writing.

When the matter was heard, the court asked the prosecutor whether he intended to offer the document into evidence. He said not at the guilt phase, although possibly at the penalty phase. Later, the prosecutor stated he took no position on its admissibility. The court asked the parties whether there was any handwriting analysis or "anything tying it to anybody here." Counsel for defendant said no. But he noted that near the top of the paper was written, "L.T. AKA Papa," which, because of the initials, he interpreted as referring to Taylor. He argued that some of the song's lyrics indicated that Taylor had shot the victims of this case.

Specifically, defendant's attorney argued that on the piece of paper, "he talks about he was just doing his job. He's a hit man. His duty was to kill for the mob. 'That nigga from out south opened his mouth.' Mr. Richardson lives out south. 'All in the family business.' That is dope dealing, which I think is the Richardson family business. 'He lost his wife.' That is, Koi Wilson was killed. 'Damn near his kid.' His child was almost taken away by CPS. That's a proceeding that has happened since that time. Then he goes back, goes on to talk about the things that they used to do together, going to clubs and so forth, describing his relationship with Ricky Richardson. He goes on later to indicate that he had to set up shop in a different coast. 'The feds was on me.' He was

dealing drugs in St. Louis, Missouri, when he was arrested for the crime in this case. And he was arrested by the FBI, which I think is the reference to the feds."

The court asked counsel what words he believed indicated that Taylor, rather than defendant, actually pulled the trigger. Counsel referred to these words: "It's nothing personal I was just doing my job," and "I am a hit man duty was to kill up the mob." After further discussion regarding the words, the court expressed the view that it was "speculation," and that "there's nothing that I've seen that would indicate that that's true or that you can support that in any way."

In objecting to admitting the document, Taylor's attorney argued that it contained only song lyrics; that even if defendant's interpretation of the words was correct, there was no reason to believe the lyrics stated anything that had actually happened; that the paper was not authenticated; and that there was no basis to believe Taylor wrote it rather than someone else who then gave it to him.

The court excluded the document. It found no "foundational evidence to show at this point either that Mr. Taylor wrote this, number one, or, number two, that it actually is related to the facts of this case." It believed there was not "enough things that fit here . . . . And without some further support to show that this is really related to this case in the sense that it is . . . an indirect confession, I don't think that it is probative enough to outweigh its prejudicial effect. It clearly has a very prejudicial effect in this sense, that the person writing this suggests that they're out killing people for the mob, and so forth. But . . . that's just pure speculation. And there just isn't a sufficient offer of proof in my view to justify admitting this. So, I think you need a lot more before that would be admissible." In response to an inquiry from defendant's attorney, the court stated, "You can try again if you want to, but I just don't see any basis for it at this point." Defendant did not raise the matter again.

26

Defendant contends the court erred in excluding the document. The Attorney General responds that the court acted within its discretion. Preliminarily, defendant argues that, because the prosecutor did not object to the document at trial or argue that it was not properly authenticated, and in fact left open the possibility of seeking its admission at the penalty phase, the prosecution has forfeited the right to make these arguments on appeal. We disagree. It is true that the prosecution did not itself object to the document's admission; it took no position on the dispute between the two defendants. Instead, Taylor objected, and the court ruled, as it had to. As defendant argues, in some circumstances, a party might be estopped from changing positions in litigation to gain an advantage. (See generally *New Hampshire v. Maine* (2001) 532 U.S. 742, 749-750.) But the prosecution is not changing positions in order to gain an advantage; it remained neutral at trial. It may now defend the court's ruling in order to defend the judgment. Contrary to defendant's argument, doing so is not playing "fast and loose" with the courts.

Turning to the merits, we see no error. Only relevant evidence is admissible. (Evid. Code, § 350.) To be relevant, and thus admissible, a writing must be authenticated as being what it is claimed to be. (Evid. Code, §§ 1400, 1401; *People v. Lindberg* (2008) 45 Cal.4th 1, 52-53.) "When the relevance of proffered evidence depends on the existence of a disputed material fact or facts, the proponent of that evidence bears the burden of establishing all preliminary facts pertinent to the question of relevance. (Evid. Code, § 403, subd. (a)(1); *People v. Kaurish* (1990) 52 Cal.3d 648, 693.) The disputed evidence is inadmissible unless the court finds evidence sufficient to sustain a finding that those pertinent preliminary facts exist. (Evid. Code, § 403.) The trial court is accorded broad discretion in determining the relevance of evidence." (*People v. Lucas* (2014) 60 Cal.4th 153, 229.)

The court did not abuse its discretion. The piece of paper lacked foundation in several respects. It appears undisputed that it was found in Taylor's jail cell, but no evidence was presented at trial — such as handwriting comparison testimony (see *People v. Lucas*, *supra*, 60 Cal.4th at p. 229) — that he wrote it. Despite the initials, it might not refer to Taylor at all. No evidence was presented that Taylor was also known as "Papa." It is not certain that the words refer to this case. The words also do not indicate that "L.T." was the actual perpetrator rather than some other kind of participant in whatever events the words referred to. Moreover, it appears the words were merely rap lyrics. No reason appears to assume they relate actual events. As counsel for Taylor aptly noted in arguing the matter, if, hypothetically, a piece of paper were found in Don McLean's home containing the handwritten words, "Drove my Chevy to the levee but the levee was dry," that would not mean that McLean personally drove a Chevrolet to a levee and discovered it lacked water.

Additionally, even if we assume the document had some marginal relevance, the court additionally acted within its discretion when it found that its prejudicial effect outweighed any probative value. (Evid. Code, § 352; *People v. Linton* (2013) 56 Cal.4th 1146, 1182-1183.) As the court noted, the document was prejudicial to Taylor when it suggested he was involved with the "mob." No evidence exists that the crime of this case was gang related.

### C. Admission of a Letter for a Nonhearsay Purpose

Tino Yarborough testified for defendant. On direct examination, he said that Taylor had threatened him. When asked to explain, he said, "I have a letter right here." Defendant's attorney asked whether Taylor had given him the letter. He responded, "Yes. I'm in the hole right now, and a trustee slid it under my door." Taylor's attorney objected that the answer was nonresponsive, which the

28

court sustained. Defendant's attorney asked the witness whether Taylor had personally said anything to him. He responded, "Not to me personally." Defendant's attorney then asked, "Are you saying the only thing that's happened is somebody slid something under your cell door?" When Taylor's attorney objected, the court stated, "the question is whether Mr. Taylor said anything to you himself. And the answer I take it is no; is that correct?" The witness answered yes, and the questioning went on to other matters.

Later, outside the jury's presence, defendant's attorney said that he had already seen the note the witness referred to during his testimony. Stating that everyone should see it, the court directed the witness to produce the note, and the attorneys reviewed it. Taylor's attorney then argued that the "answer regarding the threat still stands. We've now got a copy of this letter in which the only threat says, basically, I didn't do it and don't get up on the stand and lie, which is hardly a threat. . . . [T]he fact that that particular answer, that he received a threat from Mr. Taylor, still stands before the jury . . . leaves the jury with an improper impression." She asked to be able to admit the note so the jury could see for itself that it did not contain a threat. Over defendant's objection, the court allowed the jury to hear the contents of the letter.

Accordingly, on cross-examination by Taylor's attorney, Yarborough identified the letter as the one from Taylor that he believed contained the threat. He cited language, "I'll feel sorry for you," as being threatening. Then the prosecutor had the witness read the letter to the jury. The letter said that the witness's uncle, i.e., defendant, "did that" and was trying to blame Taylor. The letter concluded, "I love you little nigga, but don't go up there lying. If you do, I'll feel sorry for you little cousin. Real talk, love you little cuzzo."

At defendant's request, and over Taylor's objection, the court agreed to give the jury a limiting instruction regarding the letter. It instructed, "Evidence of

29

the contents of the letter produced in court by the witness Tino Yarborough was not admitted for the truth of the matters stated in the letter, but only on the question of the truthfulness of Mr. Yarborough's testimony that the letter did or did not contain a threat. Do not consider this evidence for any purpose except the limited purpose for which it was admitted."

Defendant contends the court erred in permitting the jury to hear the contents of the letter. However, because his own witness testified about the supposed threat in the letter, the court properly allowed the jury to hear of the letter's contents so it could judge for itself whether it contained a threat.

Evidence Code section 356 provides: "Where part of [a] . . . writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed." (*People v. Arias* (1996) 13 Cal.4th 92, 156.)

The witness, Yarborough, produced the letter that he claimed contained a threat. The letter said that defendant "did that" and was trying to blame Taylor, and it told Yarborough not to lie. Yarborough interpreted this language as a threat, but the jury was entitled to interpret it otherwise. In order to do so, it had to know what the letter said. Contrary to defendant's argument, the court did not have to admit only the portion of the letter exhorting Yarborough not to lie. That portion, standing alone, could not be fully understood without the earlier statement that defendant had done it and was trying to blame Taylor. Without knowing all of the letter's contents, the jury might have had a misleading impression of the subject.

30

The entire letter was relevant to determining whether it contained the threat about which the witness testified.

The letter was not admitted for its truth but only as it bore on the witness's claim of a threat, and the court so instructed the jury. Because the witness claimed the letter contained a threat, whether it actually did so was relevant to his credibility. (See *People v. Burgener* (2003) 29 Cal.4th 833, 869.) "Inasmuch as the jury was promptly and correctly instructed as to the limited purpose of the evidence, we cannot say that the trial court abused its discretion under Evidence Code section 352 in allowing the testimony." (*Id*. at p. 870.)

Citing *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518, defendant contends admitting the letter's contents violated his confrontation rights. However, he did not object on that basis at trial and thus may not make the claim on appeal. (*People v. Pearson* (2013) 56 Cal.4th 393, 460.) The claim also lacks merit for two reasons. First, Evidence Code section 356 " 'is founded on the equitable notion that a party who elects to introduce a part of a conversation is precluded from objecting on confrontation clause grounds to introduction by the opposing party of other parts of the conversation which are necessary to make the entirety of the conversation understood.' " (*People v. Vines* (2011) 51 Cal.4th 830, 862, quoting *People v. Parrish* (2007) 152 Cal.App.4th 263, 272-273.) For this reason, nothing in the line of cases defendant cites "speaks to this situation." (*Vines*, at p. 863.) Second, the contents of the letter were not offered for their truth but for the nonhearsay purpose of allowing the jury to determine whether they contained a threat. "[T]here are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes." (*People v. Cage* (2007) 40 Cal.4th 965, 975, fn. 6.)

31

**D. Exclusion of Evidence of the Contents of a Letter by Defendant**

Codefendant Taylor called as a witness inmate Larry Rhodes, who had told Detective Anderson that defendant had told him that he, defendant, had shot Richardson. At trial, Rhodes admitted telling the detective that but said he had lied. He also said that Detective Anderson had come to question him about a letter he had "supposedly" received from defendant but no longer possessed. He refused to give Detective Anderson the letter. Rhodes said nothing more about the letter.

Taylor called Detective Anderson to testify about Rhodes's statement. The direct examination and the prosecutor's cross-examination did not mention the letter. But defendant's attorney cross-examined him about it. Detective Anderson testified on defendant's cross-examination that when he interviewed Rhodes, Rhodes handed him a letter that he, Rhodes, said had come from defendant. The detective read the letter, but Rhodes refused to let him keep it.

Outside the jury's presence, defendant's attorney sought to have Detective Anderson testify about the letter's contents. As an offer of proof, he stated that, according to the detective's report, in the letter, defendant denied involvement in the shooting, although he admitted that he was present. Counsel argued that the letter was part of the same conversation in which Rhodes had said that defendant told him he shot Richardson. Finding the letter to be hearsay, the court refused to admit it.

Later, again outside the jury's presence, defendant sought to admit at least testimony that defendant did not admit shooting Richardson in the letter. He argued that "where it stands now . . . , [the] impression that the jury has is that the letter corroborates this statement Mr. Rhodes made, when in fact it doesn't. It says the exact opposite." The prosecutor argued there was no implication that defendant admitted shooting Richardson in the letter. Taylor's counsel objected, arguing that "it's a backhanded way of trying to get in a self-serving declaration."

32

After further discussion, and partly due to concerns about authenticating the letter, the court denied the request. It found that such testimony would be more prejudicial than probative under Evidence Code section 352.

Defendant contends the court erred in not admitting evidence of the letter's contents. He argues this situation was similar to the situation regarding the letter that his witness, Yarborough, had produced and claimed contained a threat. He argues that if the letter Yarborough produced was admissible, so too was testimony about the contents of the letter Rhodes mentioned. But the two situations are different. The letter Rhodes mentioned was not part of the conversation in which, according to what Rhodes told Detective Anderson, defendant said he had shot Richardson. Citing the portion of Evidence Code section 356 that states that "when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence," defendant argues the letter was necessary to understand the statement. We disagree. The letter was separate from the statement. Defendant's offer of proof did not show that anything in the letter was necessary, or helpful, to understand defendant's statement, if in fact he made it. Excluding evidence of the letter's contents did not create a misleading impression of the significance or meaning of that statement. Contrary to defendant's argument, the evidence was also not necessary to avoid a misleading impression of the conversation between Rhodes and Detective Anderson. Whatever was in that letter was inadmissible hearsay.

Defendant notes that Rhodes, whom codefendant Taylor called, mentioned the letter. But Rhodes said nothing suggesting what its contents might be. Nothing in Rhodes's brief mention of it opened the door to defendant's admitting the letter's contents. Defendant also argues that Detective Anderson's testimony created the misleading impression that the letter corroborated defendant's

33

purported statement that he shot Richardson, when in fact it did the opposite. We see no such false impression. Indeed, the facts that Detective Anderson seemed uninterested in the letter, and only defendant's attorney questioned Rhodes about it, would, if anything, suggest to the jury that the letter's contents were favorable to defendant. In any event, any misleading impression was defendant's doing, as only he questioned Detective Anderson about the letter.

If defendant wished to present evidence that he denied shooting Richardson, he had to use evidence that is admissible under the Evidence Code, as he actually did when he testified that he did not shoot Richardson and denied telling Rhodes that he had shot him. The trial court acted within its discretion in not admitting evidence about the letter's contents.

### E. The Codefendant's Questioning Defendant About Gang Affiliation

When defendant testified, his attorney asked him why he had not reported the shooting to the police. He responded that, after the shooting, he "was threatened by Troy Taylor's Sutter Street gang members." On cross-examination by the prosecutor, he reiterated that he was not afraid of Taylor but was afraid of "his Sutter Street gang friends." On cross-examination by codefendant Taylor, he testified that he did not associate with the Sutter Street gang but knew them and their parents. He testified, "I knew they were gang members. They carry guns. I don't."

Taylor's attorney then asked defendant, "Now, you knew they were gang members because you were a long-time member of the Black Guerrilla Family, right?" He responded, "About 20 some years ago, right." Defendant objected to the testimony, which the court overruled. Taylor's attorney then asked, "You were a gang member at one point, but you weren't any longer, so that's why you were scared of those kids?" Defendant responded, "That's not the reason why I

34

was scared of them. I was scared of them because of what they told me." Defendant's testimony then went onto other areas, and the matter of defendant's gang membership was never again mentioned.

Defendant contends the trial court erred in overruling his objection, and that the testimony about his former gang membership rendered the trial fundamentally unfair. We disagree.

Trial courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) We review the trial court's ruling for abuse of discretion. (*Ibid.*) Here, the prosecution presented no evidence of gang membership, and the case contained none at all until defendant himself branded Taylor a gang member. Once defendant interjected Taylor's alleged gang membership, the court had discretion to permit this brief questioning by Taylor to present a more balanced picture and to aid the jury in evaluating defendant's claim that he was afraid of Taylor's gang. (See *People v. Jordan* (2003) 108 Cal.App.4th 349, 365-366 [defendant's interjection of gang issue opened door to evidence of his gang membership].)

Moreover, in this case, there was little danger of prejudice. The jury knew there was no evidence the charged offense was gang related. Taylor was the only one who elicited evidence of defendant's gang membership and only then in response to defendant's testimony about Taylor's membership. The sole disputed factual issue for the jury to resolve was whether defendant or Taylor had shot Richardson and Wilson. There were no other candidates. But the jury heard that *both* had been gang members — although defendant only many years earlier. Thus, it was unlikely the jury would rely on gang membership in resolving this dispute. We see no abuse of discretion and no prejudice.

35

### F.  Claims of Instructional Error

Defendant reiterates two claims of instructional error we have repeatedly rejected.  Contrary to his contentions:  (1) the trial court did not err in instructing the jury on first degree murder even though the information only charged murder under Penal Code section 187 without specifying the degree (*People v. Jones* (2013) 57 Cal.4th 899, 967-969); and (2) the trial court need not instruct the jury it had to agree unanimously on a particular theory of first degree murder (*id*. at p. 973).

### G.  Admission of Evidence of the Injuries One of Defendant's Victims Suffered

During the penalty phase, the prosecution sought to bring into the courtroom Lynette D., the victim of the September 19, 1980, shooting, so the jury could see what defendant and his cohort, Gaines, had done to her.  Due to her condition, she was incapable of testifying.  When defendant objected, the court refused to allow Lynette herself to appear but, over defendant's further objection, it allowed the prosecution to present evidence of the injuries she had suffered.

Lynette's mother testified about how she and her husband had learned of Lynette's shooting and about her injuries.  Lynette had been in a hospital for 11 months, was a semi-comatose quadriplegic at the time of trial, and required intensive care 24 hours a day, including ventilator treatments every hour for a respiratory problem.  At one point, the mother testified that her husband had had a "nervous breakdown through all this" and could not cope.  The court sustained defendant's objection to this testimony on relevance grounds and instructed the jury "to consider only the young lady's present condition."

Defendant contends the court erred in permitting the prosecution to present evidence of Lynette's injuries.  It did not err.  At a penalty phase, evidence of the defendant's other crimes of violence is admissible under Penal Code section

190.3, factor (b). Such evidence may include the impact of the crime on the victim, including the injuries suffered. Indeed, although the court did not allow such evidence in this case, we have held that such evidence may include the impact of the crime on the victim's friends and family. (*People v. Johnson* (2016) 62 Cal.4th 600, 643-650; see *id*. at pp. 660-661 (conc. opn., of Cuéllar, J.) [agreeing that evidence of the injuries the victim suffered is admissible while arguing that evidence of the impact on the family and friends is inadmissible].) The court acted within its discretion when it did not allow the prosecution to present Lynette to the jury but allowed her mother to testify about her injuries.

## H. Admission of Evidence of Defendant's Parole History

During the penalty phase, over defendant's objection, the court admitted into evidence a prison packet that proved his convictions for assault with intent to commit murder, assault with a deadly weapon, and dissuading a witness. The packet also contained a "chronological history" with handwritten notations of defendant's prison history from May 12, 1981 to February 8, 1991. The latter included information about his release on parole and subsequent arrest or revocation of parole on certain occasions.

When defendant objected, the court noted that the packet showed "the history of his incarceration," but it stated it did not "see anything particularly prejudicial in it." The prosecutor contended that the time defendant was in prison was relevant in light of Gwen Taylor's testimony. He argued that Taylor "seemed to indicate that she did not want to get Mr. Melendez in further trouble by testifying that he had a sexual or romantic relationship with her . . . during her minority, which would have been 1977 to 1981. Which means that any type of relationship that she had with him had to occur [in] 1981 and subsequent to that point. Unfortunately though, . . . she knew and that's why she said she couldn't

37

remember. She knew that Mr. Melendez was incarcerated during that period of time. So she couldn't have had that type of relationship until he was released from prison on the Lynette [D.] shooting. So more likely than not, any sexual or romantic relationship that she had with him was when Mr. Melendez was an adult, 21 years of age or around that period of time, and she was between the ages [of] 14 and 18."

The court asked about the significance of this. The prosecutor responded that the significance was "the willingness of individuals, one, to essentially lie for Mr. Melendez just to shape their testimony to help him . . . . But now this person is willing to do it. And it also goes to — I mean, it seems to be a pattern that Mr. Melendez preyed on underage girls during this period of time." The court interjected that the latter point was not admissible at the penalty phase. It stated that "the only thing it's really relevant to is admissible to her credibility certainly. So it is significant in that regard." It found nothing prejudicial in the records "because everybody knows that the defendant was in prison. And there's nothing in these records that . . . in any way reflects badly on him, so I don't see any prejudice to it." It admitted the packet on that basis, finding that it "does create some reasonable evidentiary inferences."

Defendant contends the court erred in permitting the jury to see that portion of the packet that provided the parole information. He argues that, contrary to what the court stated, it did contain information that reflected badly on him, namely, a few entries indicating rearrests and parole revocations. But these were just summary handwritten notations that would be of little meaning to the jurors and that contained no information about why he was arrested or why his parole was revoked. None of that history was mentioned in any of the arguments to the jury. The history of defendant's incarceration was relevant for the reason the court identified, and any prejudice was minimal. We see no abuse of discretion in

admitting the entire document and no prejudice in light of the case as a whole. (*People v. Martinez* (2003) 31 Cal.4th 673, 695-696.)

### I. Failure to Conduct a Hearing on the Admissibility of Other Crimes Evidence

At the outset of the penalty phase, defendant's attorney requested an offer of proof regarding any of the other crimes the prosecution sought to prove for which there was no conviction. He explained that the prosecution had to prove the crimes beyond a reasonable doubt and that "there's a problem of prejudice there if you get halfway through it." He was concerned that a witness might not want to testify, and the prosecution might not be able to prove its case. The court denied the request.

The prosecution called a witness who testified that she had been shot in 1978 and lost her leg. But the witness did not identify anyone as the gunman. The prosecution presented no other evidence about this incident. Later, outside of the jury's presence, the court asked about the relevance of this testimony. The prosecutor explained that defendant had been convicted of a misdemeanor arising out of this incident, and that he thought the witness would identify defendant. (Only felony convictions are admissible in aggravation under Pen. Code § 190.3, factor (c).) He also explained that he had tried but failed to obtain the testimony of another witness who could identify defendant. He agreed that he had not proven the crime. Defendant requested the court to admonish the jury not to consider the evidence, and the court agreed to do so. The court also found that the evidence had been offered in good faith.

The court admonished the jury "that there was a witness that was offered in the penalty phase at the very beginning of the penalty phase. You may recall Rita Moppins-Brown. She was the lady that testified she had lost her leg and had an artificial leg. The court has granted a motion to strike that — all that testimony,

39

that witness's testimony. So I'm going to admonish you to disregard all the testimony of Rita Moppins-Brown. Tear it out of you notes, pretend it never existed. You may not consider that testimony in making your decision in this phase of the case, so that — that testimony is stricken from the record." When it instructed the jury at the end of the penalty phase, the court reiterated that, "as you recall, I specifically instructed you to disregard the evidence relating to the testimony of Rita Moppins-Brown as the court has excluded that evidence."

In *People v. Phillips* (1985) 41 Cal.3d 29, 72, footnote 25, a plurality of this court stated that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." Defendant contends the court erred in not holding such a hearing in this case.

Preliminarily, the Attorney General contends defendant has forfeited the claim because he requested only an offer of proof rather than a hearing under *Phillips*, *supra*, 41 Cal.3d 29. We disagree. Defendant did not specifically cite *Phillips*, but he did not have to do so. His request came with an explanation that he was trying to avoid the problem *Phillips* addressed. That was sufficient to preserve the contention.

On the merits, we see no error and no prejudice. In *People v. Phillips*, *supra*, 41 Cal.3d 29, we did not require a preliminary inquiry. "Nor did we predicate the admission of evidence of unadjudicated criminal conduct on the outcome of such an inquiry. [Citation.] Therefore, the trial court did not err in denying his request to conduct a *Phillips* hearing." (*People v. Young* (2005) 34 Cal.4th 1149, 1209.) Although the problem *Phillips* was concerned about actually occurred in this case, that circumstance did not make the earlier ruling erroneous. Indeed, an offer of proof of the kind defendant requested might not have

40

uncovered the problem that later occurred. Although we once again reiterate that holding such a hearing may be advisable, we see no error in this case.

Defendant also suffered no prejudice. On two occasions, the court firmly instructed the jury to disregard the testimony, and we presume the jury did so. (*People v. Ervine* (2009) 47 Cal.4th 745, 776.) Defendant argues the court should have given a stronger admonition. But he did not request one at trial, and we believe the actual one was sufficient.

What occurred here was unfortunate, but it is the sort of event that sometimes happens in a trial. As the Attorney General notes, "Trials are dynamic processes and not every aspect is predictable or perfectly orchestrated." Witnesses sometimes blurt things out or, as here, testify in unanticipated ways. We have to trust the trial court to take corrective measures when necessary, as the court here did, and the jury to follow the court's instructions. It would be easy for the jury to understand that no evidence was ever introduced to show that defendant was responsible for the witness's injury, and therefore it had to disregard her testimony. We have no basis even to speculate that the jury based its verdict on the stricken testimony rather than the evidence it properly heard.

### J. Cumulative prejudice

Defendant contends the cumulative effect of the errors he asserts was prejudicial. However, we have found no error to cumulate. Any assumed error was also harmless, even accumulated.

### K. Other Contentions

Defendant reiterates many challenges to California's death penalty law that we have repeatedly rejected. We see no reason to reconsider our previous holdings.

41

Penal Code section 190.2 is not impermissibly broad, and Penal Code section 190.3, factor (a), does not make the death penalty arbitrary or capricious. Jurors do not have to find aggravating factors true beyond a reasonable doubt except for other crimes and prior convictions.  The court does not have to instruct the jury on burden of proof.  Except for the verdict itself, the jury does not have to achieve unanimity, and it does not have to make written findings.  (*People v. Cordova* (2015) 62 Cal.4th 104, 150.)  Use of the words "so substantial" and "warrants" rather than other words does not render the standard instructions invalid.  (*People v. Contreras* (2013) 58 Cal.4th 123, 169-170.)  The court did not improperly fail to inform the jury that it must return a verdict of life without the possibility of parole if the mitigating circumstances outweigh the aggravating circumstances, and the court need not instruct the jury on a presumption of life. (*People v. Johnson* (2015) 60 Cal.4th 966, 997.)  Penal Code section 190.3's use of the adjectives "extreme" and "substantial" to describe some of the mitigating factors does not limit the jury's consideration of factors in mitigation.  (*Cordova*, at p. 150.)  The trial court did not have to delete inapplicable sentencing factors or instruct that mitigating factors were relevant solely in mitigation.  (*People v. Rountree* (2013) 56 Cal.4th 823, 863.)  Intercase proportionality review is not required.  California's differing treatment of capital and noncapital defendants does not violate equal protection, and use of the death penalty does not violate international law.  (*Cordova*, at p. 150.)

42

### III. CONCLUSION

We affirm the judgment.

CHIN, J.

**WE CONCUR:**

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CORRIGAN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Melendez
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S118384
**Date Filed:** December 8, 2016
_____

**Court:** Superior
**County:** San Joaquin
**Judge:** Terrence Van Oss

_____

**Counsel:**

Saor E. Stetler, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Sean McCoy and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Saor E. Stetler
P.O. Box 2189
Mill Valley, CA  94942-2189
(415) 388-8924

A. Kay Lauterbach
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 327-7876