Filed 8/2/23  P. v. Simpson CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095568 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE010597) |
| v. | |
| CHRISTOPHER SIMPSON, | |
| Defendant and Appellant. | |

A jury found defendant Christopher Simpson guilty of first degree murder, and it found true allegations that he personally and intentionally discharged a firearm.  (Pen. Code, §§ 187, subd. (a), 12022.53, subds. (b), (c), (d); undesignated statutory references are to the Penal Code.)  The trial court sentenced defendant to a prison term of 25 years to life plus 25 years to life for the firearm use enhancement for causing great bodily injury or death.  (§ 12022.53, subd. (d).)

1

Defendant contends on appeal that (1) the trial court erred by denying his motion to exclude gang references from the evidence; (2) the trial court abused its discretion by denying his request to strike the firearm use enhancement; and (3) we should remand the matter to the juvenile court to permit him to file an appeal from the juvenile court's transfer order pursuant to recently enacted Assembly Bill No. 624 (2021-2022 Reg. Sess.) (Assembly Bill 624).

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The murder of Macy Murphy

On May 29, 2016, at 2:40 p.m., paramedics found a deceased female identified as 15-year-old Macy Murphy slumped in the driver's seat of a blue Chevy Trailblazer. She had suffered a gunshot wound to the back left side of her neck. She had been dead for a period of time as there was rigor throughout her body. Officers found a single nine-millimeter shell casing on the back floorboard. Both rear windows were rolled down.

Murphy's cause of death was a single gunshot wound to the left side of her neck. The direction of the injury was left to right, back to front, and slightly downward. No traces of alcohol, medication, or common drugs of abuse were found in Murphy's blood. Police never found the weapon used in the shooting.

Around midnight the night before, Scott P. and his sister were driving to their home on the street where Murphy would be found. They passed a group of people on the street who were hanging out. Scott P. recognized some of the people from the high school which he attended. He later told police he recognized defendant, Ryan Lemp, and someone named Richard in the group. Scott P. saw a blue SUV and another silver car. About 45 minutes later, while Scott P. was in his garage, he heard a gunshot. He went outside to look around. The group and the other cars were gone. The blue SUV was still there.

2

On the morning of May 28, 2016, Richard Kado and Dayshawn Barker went to Murphy's house. The three watched TV, listened to music, and went with Murphy to pick up her sister's boyfriend. Around 5:00 p.m., they went to a McDonald's in Murphy's blue SUV. Barker had arranged for them to meet up with Deonte Whiteside, Alante Broughton, defendant, and others there. Kado knew defendant from when they had both attended high school. Kado had later transferred to a different school. At the time of the murder, defendant was 17 years old.

The group hung out at McDonald's for a couple of hours. Others hung out with them. Around 7:00 or 8:00 p.m., the entire group left McDonald's and went to a party. After the group went into the party for a short time, they went outside, but only hung out for another 15-20 minutes. Around 9:00 or 10:00 p.m., they went to the house of a person named Ace.

After about an hour and a half at Ace's, Kado had been drinking and told Murphy he wanted to go home. She wanted to stay a little longer, so Kado walked to a Honda owned by Ryan Lemp. Outside with him were Danny Robinson, Lemp, Whiteside, Broughton, Ace, defendant, and others. Barker and Murphy were seated inside Murphy's car. Barker was in the front passenger seat next to Murphy.

Kado talked on his phone with a girlfriend while standing near the driver's side of Lemp's car. After he ended the call and was about to get inside the Honda (Lemp had asked him to drive), he saw a very bright flash and heard a loud boom. Everyone freaked out. Kado saw Barker get out of Murphy's car and he saw Murphy on the steering wheel. In shock, he walked to Murphy's car to see if Murphy was all right. As he did, Whiteside pulled him back to Lemp's Honda.

Robinson told Kado to drive, and that if he didn't, Robinson would "blow [his] head off." Kado asked defendant what was wrong, and "all [defendant] said was he had

to do it." Kado asked defendant, "Had to do what?" Defendant "kept saying, I had to do it." Kado saw defendant was holding a handgun. He later told police it was a nine-millimeter.

At that point, Whiteside slapped Kado and told him, "You got to focus right now." He got into the Honda's driver's seat. Whiteside, Robinson, Barker, Broughton, and defendant also got into the Honda. Whiteside told Kado, "Drive, Richard, or you don't want to be next." Scared, Kado interpreted that to mean he was going to die next. As he drove, Kado heard defendant and Robinson say that if anybody talked, "[t]hey would be dealt with." Whiteside and Robinson kept repeating the threat during the drive.

Kado drove to a gas station to get gas for the Honda. Whiteside and Robinson paid for the gas. One of the guys told Kado to drive to "West Sac" because Robinson, Broughton, and defendant wanted to go to Broughton's house. Kado complied. He dropped them off by a high school nearby. Kado then drove to Barker's house in a neighboring town. There, Kado and Barker got out of the car, and Lemp and Whiteside drove off. At some point during the ordeal, Kado cried. He cried because Murphy was his best friend, he felt helpless, hopeless, and scared, and he had never experienced something like that before.

Kado told a sheriff's investigator that he saw defendant with a gun right after the shooting. He recalled seeing the gun because he could see the red scope light bouncing as defendant ran.

Dayshawn Barker testified that while he was sitting in Murphy's car in front of Ace's house, he saw a shadow or figure in his peripheral vision, then heard a gunshot and saw a flash from the area behind Murphy between the front driver's side window and the rear seat. Murphy leaned over the steering wheel. Barker ran to Lemp's car and got in the back seat. Kado, Whiteside, Robinson, Broughton, defendant, and possibly Lemp were already in the car. On the way to West Sacramento, there was a lot of commotion inside the car. Defendant said, "What happened, happened[.]" Everyone kept asking,

4

"What happened?" and defendant said, "Oh, well[.]" Barker had seen defendant carrying a backpack most of the night. Defendant still had the backpack when he got out of the car in West Sacramento.

Barker told police that he had been turning to say goodnight to Murphy and was starting to get out of Murphy's car when he saw defendant in his peripheral vision. Barker wondered what defendant was doing at the back window behind Murphy. Defendant was standing right by the car's pillar between the front driver's side door and the rear passenger door. Defendant leaned into the car and reached his hand inside, and then Barker heard the shot. Barker fell out of the car, and when he looked back at Murphy, he saw defendant looking inside. Barker told the detective the gun defendant held was a black handgun like the detective's gun.

During the interview with the detective, Barker said defendant was the shooter he saw. Barker also said that defendant ran toward the Honda and got in after he fired the shot. The detective, trying to confirm the type of handgun Barker had seen, explained to Barker the difference between a revolver and a semiautomatic handgun. Barker said the gun was not a revolver; it was like the gun the detective carried on his hip.

Alante Broughton told an interviewing detective that defendant and Robinson were the only people he saw near the driver's side of Murphy's car when the shot was fired. Broughton definitely thought one of those two people fired the shot. He also said that defendant had a backpack that night. Ryan Lemp also told officers that he saw defendant carrying a backpack that night.

The parties stipulated that Deonte Whiteside and Danny Robinson were unavailable to testify.

### Kik text messages

Sara Morin, a crime analyst with the Department of Justice, analyzed a cell phone that had been referred to as "Gwendolyn's iPhone." She found data linking the phone to

defendant. Several accounts listed on the phone were linked to defendant with names such as "Fly Boi Chris," "Chris Simpson," and "FlyBoi.Braze." The phone included photographs of defendant and screenshots from social media accounts that referenced the names associated with defendant. Text messages also referenced defendant. In May 2016, the phone accessed the School Loop website of the high school defendant attended, which is a website where students and parents view assignments and communicate with teachers. Morin concluded from this data that defendant utilized the phone, particularly in May 2016.

Other data in the phone related to Murphy. A photo of Murphy was linked in the phone's "Contacts." A Kik Messenger contact was listed in the phone's contacts as "MD" with sparkles emojis. Morin knew that Murphy had been known as "Murph Dollas" and was referred to as MD. Kik Messenger, commonly called Kik, is a free messaging application that works off Wi-Fi or mobile phone data. It is used to exchange communications via text, videos, and images.

The phone recorded text communications between defendant and Murphy. On May 16, 2016, at 7:43 p.m., defendant contacted Murphy via Snapchat. Under his account named "Chris is a stoner," defendant wrote, "Could you slide on me and Dan this weekend?" Murphy wrote, "N do what?" Defendant said, "Drop us off somewhere." Murphy wrote, "Need $$$ for that." Defendant replied, "It's good."

Defendant's phone contained three screenshots from Twitter of a conversation between Murphy and other people. In the messages, it appeared to Morin that Murphy was being accused of taking sides. Someone named "Nero Lanes" said to Murphy, "Sounds like you takin' Blood side."

Defendant's phone retained a Kik Messenger conversation between two persons, with a third person joining in. Someone had attempted to delete the conversation, but the phone had not deleted it. The conversation was between Fly Boi Chris and someone with the username of Daay_Smacka. A photograph of defendant was associated with

6

username Fly Boi Chris. A third person who joined the conversation had the username Danny_keep it 3 hunna (Danny).

The conversation occurred around 9:00 p.m. on May 29, 2016, the day Murphy's body was found. It proceeded as follows:

Daay_Smacka: "Uzzin."

Fly Boi Chris: "Wassup, Fab?"

Daay_Smacka: "Invite me to group chat."

Fly Boi Chris: "I'm not even in it there; no, ain't no more group chat. You heard what happen to one girl?"

Daay_Smacka: "Bitch Macy got her shit drilled. [Five emoji faces with tears of joy.]" "And I don't give a fuck."

Fly Boi Chris: "I did it, bruh."

Daay_Smacka: "Swear to God, you blew it?"

Fly Boi Chris: "On God."

Daay_Smacka: "No, you didn't, blood."

Fly Boi Chris: "Bruh, what I gotta lie for?"

At this point, the third person joined the conversation. The dialogue continued:

Fly Boi Chris: "Dan, tell this [n-word]."

Daay_Smacka: "How it happen?"

Fly Boi Chris: "Back of the dome."

Daay_Smacka: "Damn, [two emoji faces with tears of joy] she was lackin."

Morin stated that from her training and experience, "dome" meant "head," and "lackin" meant Murphy was not paying attention.

Daay_Smacka: "?"

Fly Boi Chris: "Lackin."

Danny: "Bruh, her head smacked the fuck out the steering wheel."

7

Daay_Smacka: "Fuck, Blood, laughin my ass off." "This shit funny as fuck." "Ma shit got a body on it."

Danny: "[Three loudly crying face emojis and one weary face]"

Fly Boi Chris: "[Two faces with tears of joy]"

Daay_Smacka: "And nobody is gone find out."

Danny: "No duh."

Daay_Smacka: "Nah, that's what I'm saying, laugh out loud."

Danny: "Bruh, I don't know 'bout Rondo and Nero. They was finna start crying, bruh." "I'm, like, what the fuck?"

Fly Boi Chris: "For real." "Bruh, I don't even know."

Defendant stated on cross-examination that Rondo is Richard Kado and Nero is Dayshawn Barker.

In the conversation, Danny stated, "Bruh, she was in a car, slumped for 12 hours, before they came." Daay_Smacka said, "Gerald next." Fly Boi Chris sent two carrot emojis, which Morin said meant in agreement or an emphasis on what the previous person wrote. Daay_Smacka asked when the killing occurred. Danny said, "We did MD last night."

The chat continued:

Daay_Smacka: "She had it coming for the longest."

Fly Boi Chris: "I wasn't playing with her."

Daay_Smacka: "How'd you all execute?"

Fly Boi Chris: "What you mean?"

Daay_Smacka: "How'd you all get her to slide?"

Fly Boi Chris: "Dayshawn." "Basically."

Morin stated that "slide" referred to how you would get someone to come to you.

Danny: "She thought it was sweet."

Fly Boi Chris: "[Two carrot emojis.]"

8

Danny: "I think she already knew, though." "She was dumb ass quiet."

Fly Boi Chris: "We was playing it cool the whole night, though."

Later in the conversation, the three discussed what they knew of the investigation, that "they" had already talked to "Day-Day" and "Richard," and that word of the crime was spreading. The chat continued:

Fly Boi Chris: "I wish them [n-word]s was never with us."

Danny: "Man, really pussy."

Daay_Smacka: "[Three emojis with faces of tears of joy.]"

Danny: "I already knew [n-word]s really wasn't ready for this real gang shit."

Fly Boi Chris: "Not ready."

Defendant then sent as an attachment a tweet from someone daring "you little privileged kids to go to Oakland or Chicago and say, Sacramento is hood. . . . I swear, you all just love to hype everything."

Fly Boi Chris: "[Two faces with tears of joy.]"

Danny: "Man. [Two faces with tears of joy.]"

Daay_Smacka: "I'll smoke blood, on FAB."

Morin understood FAB to mean "Fourth Avenue Bloods."

Phone calls from detention facility

On June 17, 2016, defendant called his sister from the detention facility. During the call, his sister said that "Tru" was "basically sayin' that, uh, Yellow Tooth and, uh, Dawshawn rat and whatever." When defendant said, "Swear?" his sister replied, "Yep. That's word around. They rattin', and they – after her – after they got talked to for several hours, they came out cryin', hella shit. That's what he sayin' though." At trial, Dayshawn Barker testified that Deonte Whiteside went by the nickname "Tru."

On June 18, 2016, defendant called his brother Mike from his detention facility. Mike confirmed to defendant that some people had snitched. Mike told "Richard and

9

Tru" that they needed to be safe. Defendant said, and Mike confirmed, that Tru said he was going to come to court. Part of their conversation then went as follows:

Defendant: "Bruh, if he comes at me a rat, testify against me, bruh (laughs)."

Mike: "Oh, you know."

D: "Man, bro. It's good though. But . . ."

M: "No, it ain't good."

D: "Whatever though. We can't do nothin' about it."

M: "Yeah. That's what you think. Bruh, I can. We gonna do something when you get out."

D: "Yeah. That's gonna be in hella years (laughs)."

Defense

Defendant testified on his own behalf. He said that a week before the shooting, Murphy called Robinson "soft and not a shooter." Robinson tweeted back to Murphy that he was going to "smoke you." Defendant believed Robinson was serious.

The night of the shooting, defendant had a backpack with him, but he did not have a gun in it. When the group was getting ready to leave the house, Robinson handed defendant his gun out of his backpack. Robinson told defendant to joke around with Murphy and just show her they were not soft. He said, "Go scare her." When defendant asked who, Robinson said, "Macy for me." Robinson instructed defendant to make it "fake, like it was a robbery." Defendant asked Robinson if the gun was loaded, and Robinson said it was not. Defendant did not check whether the gun was loaded.

Defendant walked to Murphy's car with the gun. As he tried to reach into the car's rear driver's side window, his arm bumped the doorframe and the gun fired. He was shocked because he thought the gun was not loaded. He did not intend to pull the trigger.

10

Defendant testified that he said he "did it" in the Kik messages because he wanted to "look cool." He considered Danny and "Smack" to be his older brothers. They were "known to be hard"; Smack "was a – a known gangbanger, for sure." Defendant looked up to them. He thought it would be "cool" because "when you hard, you just want to claim something that you, you know, obviously didn't do, I guess -- intentionally do." He said his messages were "false bragging."

## DISCUSSION

### I

### *Evidentiary Gang References*

Defendant contends the trial court prejudicially abused its discretion and denied him due process when it allowed certain gang references in the Kik messages to be admitted into evidence. He argues the evidence was irrelevant to any contested issue and was highly prejudicial with no probative value.

#### A.    Background

Defendant filed an in limine motion to exclude any reference or argument that he is or may be gang affiliated or any gang related evidence pursuant to Evidence Code sections 210 and 352. At the hearing on the motion, the court asked the prosecutor if she planned to introduce such evidence, and the prosecutor said no. After the court granted the motion, the prosecutor clarified that she would not introduce such evidence unless it became relevant during cross-examination of some of the witnesses. She would then approach the bench and ask to discuss it. The court said if anyone wanted to relitigate the motion, they just needed to let it know.

Later, the court stated the prosecutor had pointed out that she was not going to get into the gang evidence per se, but in some of the messaging conversations there were references to "Blood," "F-A-B," and to "people not being ready for this real gang

11

expletive." The trial court stated, "[T]he People just wanted to make clear this is a conversation between the defendant and other folks, and this is the language they're using. So I'm inclined – or as I put in the Email, my tentative is, yes, I will allow that to be admitted since that is a conversation of the defendant. The Blood and F-A-B, I'm not sure the jurors would even pick that up, and the gang stuff its one reference. So it's not – it's not sort of an overwhelming sort of all kinds of gang language or information in there. [¶] So I am inclined to allow that conversation to be admitted in its current state . . . ."

The court gave defense counsel an opportunity to "convince [it] otherwise." Counsel stated, "I don't think I will be changing your mind, but it is very easy to edit out, 'This is gang shit' and things in there. It is not that much. And other than that, how easy it would be, I don't have anything to add other than what I already said."

The court responded, "And I will just note also for the record under 352 that the probative value of that evidence is not substantially outweighed by either confusing or undue prejudice."

Defendant contests the admission of two Kik messages that included gang references and the crime analyst's definition of one of the references. In one message, Danny said, "I already knew [n-word]s really wasn't ready for this real gang shit," and Fly Boi Chris replied, "Not ready." In another message, Daay_Smacka said, "I'll smoke blood, on FAB." When asked the meaning of FAB, the analyst said, "Fourth Avenue Bloods."

B.     Analysis

"The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 [].) 'Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices,

12

criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 [].) Even when it is relevant, however, 'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." ' (*People v. Melendez* (2016) 2 Cal.5th 1, 28-29; see *People v. Williams* (1997) 16 Cal.4th 153, 193.) We review the trial court's ruling for abuse of discretion." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.)

The trial court did not abuse its discretion in admitting the evidence. The evidence was relevant to establish motive, that defendant killed Murphy because she sided with an opposing gang. The jury could reasonably interpret the admitted Kik messages to mean that Danny and defendant believed the killing of Murphy was gang related, and Daay_Smacka's statement that he would "smoke blood" on the Fourth Avenue Bloods meant he would engage in violence against the Bloods, the gang with whom Murphy was accused of siding.

The court did not abuse its discretion in determining the evidence's prejudicial effect did not substantially outweigh its probative value. The gang references were minimal, and no other inflammatory gang evidence was admitted. The references likely did not create a risk the jury would improperly infer that defendant had a criminal disposition and was guilty of the charged offense for that reason. Any possible prejudicial impact did not substantially outweigh the evidence's probative value.

Even if the trial court erred in admitting the evidence, the error was harmless under any standard of prejudicial error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 17 L.Ed.2d 705].) The error was harmless beyond a reasonable doubt because the evidence against defendant was overwhelming. Defendant admitted in the Kik messages that he killed Murphy.

13

Kado and Barker identified defendant as the killer. Defendant admitted to Kado in Lemp's car that he killed Murphy. Barker saw defendant reach through the SUV's back window behind Murphy with his hands, heard the gunshot, and then saw defendant at the window holding a handgun. Broughton told police the killer was either defendant or Robinson, as they were the only people near Murphy's car.

Defendant himself raised the issue of gang relation by testifying that "Smacka" was a known "gangbanger," and defendant looked up to him like an older brother. We have no reasonable doubt that had the jury not heard the three minor gang references, it still would have found defendant guilty of first degree murder.

II

*Firearm Use Enhancement*

At sentencing, defendant asked the trial court to dismiss the firearm enhancement pursuant to section 1385. That statute lists several mitigating circumstances a court must consider when exercising its discretion to determine whether to dismiss an enhancement. (§ 1385, subd. (c)(2).) "Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).)

The trial court denied the request to dismiss the enhancement. The court considered each of the mitigating circumstances listed in section 1385, and although defendant was a juvenile when he committed the offense, the court found that dismissing the enhancement would likely result in physical injury or serious danger to others. It also considered mitigating factors listed in California Rules of Court, rules 4.428(b), 4.410, 4.421, and 4.423 (all further rule references are to the California Rules of Court), and it

14

concluded that after considering the totality of the circumstances, dismissing the enhancement would not be in the interest of justice.

Defendant contends the trial court prejudicially abused its discretion in not dismissing the enhancement. He argues the court disregarded mitigating evidence and evidence that demonstrated dismissing the enhancement would not pose a risk to public safety.

A.     <u>The court's decision was not irrational or arbitrary</u>

We review a trial court's decision not to dismiss an enhancement for an abuse of discretion. (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978 (*Alvarez*), quoting *People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831.) Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' (*Alvarez*, at p. 978, quoting *People v. Preyer* (1985) 164 Cal.App.3d 568, 573.) Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at pp. 376-377.)

The trial court's decision not to strike the enhancement was not irrational or arbitrary. The court considered each of section 1385's nine mitigating circumstances. It found no evidence to support six of the circumstances: that the enhancement would result in a discriminatory racial impact, the enhancement would result in a sentence of

15

over 20 years, the offense was connected to mental illness, the offense was not a violent felony, the offense was based on a prior conviction, and the firearm was unused or unloaded.  (§ 1385, subd. (c)(2)(A), (C), (D), (F), (H), (I).)

One of the mitigating circumstances requires the court, where multiple enhancements are alleged, to dismiss all enhancements but one.  (§ 1385, subd. (c)(2)(B).)  The court complied with this factor and dismissed two of the three enhancements found true by the jury, leaving only the enhancement under section 12022.53, subdivision (d).

Another mitigating circumstance asks whether defendant was a juvenile when he committed the offense.  (§ 1385, subd. (c)(2)(G).)  The court found this factor was applicable.

A final mitigating circumstance asks whether the current offense "is connected to prior victimization or childhood trauma."  (§ 1385, subd. (c)(2)(E).)  "Childhood trauma" means "that as a minor the person experienced physical, emotional, or sexual abuse, physical or emotional neglect.  A court may conclude that a defendant's childhood trauma was connected to the offense if, after reviewing any relevant and credible evidence . . . the court concludes that the defendant's childhood trauma substantially contributed to the defendant's involvement in the commission of the offense."  (§ 1385, subd. (c)(6)(A).)

After reviewing the evidence, the trial court disregarded this factor.  The evidence disclosed that defendant was removed from his parents' custody two days after his birth due to their unfitness.  He was raised and adopted by his grandparents from that time, and the record showed he had a healthy upbringing and childhood.

The court said defendant's biggest complaint seemed to be that his grandparents were too strict.  Speaking to the probation officer, defendant said his parents were very protective of him and his siblings.  He and his siblings would spend time with their extended family, and he did not have any friends.  His parents were respectful, lovable,

16

and very religious. He said his childhood was wonderful, and that his parents spoiled him. He was never a victim of abuse, nor did he witness domestic violence in the home.

The trial court found that to the extent there was minimal evidence of childhood trauma, to the extent defendant even remembered it, "it did not in any way substantially contribute to his involvement in the commission of this offense."

Although the court had found one mitigating factor—defendant's age at the time of the offense—it exercised its discretion and found that dismissing the firearm enhancement would endanger public safety. We quote the court's reasoning at length: "The Court reaches this conclusion based, essentially, on the entire record, but I'll – I'll throw some specific findings in there, among other things: The nature and circumstances of the offense; the victim was a 15-year-old girl who the Defendant lured to the scene and then snuck up and shot her execution-style in the back of the head, for no apparent reason, when she was completely defenseless and vulnerable; there was no struggle; there was no argument between the Defendant and the victim; he was not protecting himself or anyone else when he shot her and he immediately fled the scene after he shot her.

"The victim posed absolutely no danger to the Defendant or his family. And as far as the Court could tell, the only evidence of any motive appeared to be because the victim had disrespected the Defendant on social media.

"The evidence further showed that this was not impulsive but was, rather, a premeditated and planned-out offense.

"And the Defendant apparently made more than one attempt to lure the victim to a location where he could carry out this crime.

"The callousness exhibited by the Defendant after the murder on social media was an extremely high degree, specifically, the messages where the Defendant bragged and laughed about the killing and how he set the victim up. And he showed absolutely nothing close to remorse.

17

"In his testimony at trial, the Defendant again showed no remorse but, rather, described how hard it had been for him to be in jail awaiting trial.

"More significantly, the Defendant blatantly lied, in claiming it was all an accident, a self-serving theory that the jury easily discarded.

"In making this finding about the Defendant's testimony at trial, the Court notes that Rule of Court 4.421 and 4.408 allow the Court to consider any other factor in aggravation that reasonably relates to the Defendant.

"The Court emphasizes that it is not finding a perjury enhancement simply because the Defendant testified at trial and was convicted. Rather, the Court is specifically finding that during his testimony at trial, the Defendant made a willful statement under oath of material matters of which he knew to be false.

"See *People* [*v*.] *Howard* [(1993)] 17 Cal.App.4th 999, [*United States v*.] *Dunnigan* [(1993)] 507 U.S. 87 [113 S.Ct. 1111, 122 L.Ed.2d 445]. [Italics added.]

"Finally, the Court notes that even if properly considered the Defendant's trial testimony, that would still not change its ultimate ruling on whether or not to strike the enhancement.

"In sum . . . I'm not in any way saying because it's a 187, the enhancement doesn't get struck. What I'm saying is given the unique, heinous, callous nature of this offense, for all the reasons described above, taking into account the entire record, the Court finds that dismissing the 12022.53[, subdivision] (d) enhancement would likely result in future injury or -- physical injury or serious dangers to others."

There is nothing irrational or arbitrary in the court's analysis and ruling.

At this point, the trial court performed an alternate analysis which also shows the court's decision was not irrational or arbitrary. The court analyzed the facts under the test set forth in *People v. Pearson* (2019) 38 Cal.App.5th 112 for determining whether to strike a firearm enhancement pursuant to section 12022.53, subdivision (h). That statute gives a court discretion to strike or dismiss a firearm enhancement required by section

18

12022.53 "in the interest of justice pursuant to [s]ection 1385." (§ 12022.53, subd. (h).) To exercise its discretion under that statute, a trial court must consider factors listed in rule 4.428(b) for determining whether to strike enhancements, rule 4.410's general objectives of sentencing, and the circumstances in aggravation and mitigation listed in rules 4.421 and 4.423. (*Pearson*, at p. 117.)

Considering the factors listed in rule 4.428(b), the trial court found the enhancement does not make the crime a strike, as the underlying offense was already a strike. Imposing the enhancement accurately reflected defendant's criminal conduct on his record, given the heinous and callous nature of his conduct. The enhancement will have no effect on his award of custody credits because the underlying offense is a strike "and mandates no pretrial custody credit and strike custody credit afterwards."

The trial court considered the general objectives of sentencing set forth in rule 4.410, and it found that almost all those objectives weighed in favor of not striking the enhancement, and the remaining objectives either did not apply or were neutral. Those objectives include protecting society, punishing the defendant, encouraging the defendant to lead a law-abiding life in the future and deterring him from future offenses, deterring others from criminal conduct by demonstrating its consequences, preventing defendant from committing new crimes by isolating him for the period of incarceration, securing restitution for crime victims, achieving uniformity in sentencing, and increasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices. (Rule 4.410(a).)

The trial court considered the circumstances in aggravation set forth in rule 4.421. It found that many of them "weigh heavily against" striking the enhancement. The crime involved great violence and bodily harm. Its senseless nature indicated a high degree of viciousness, cruelty, and callousness. The Defendant was armed. The victim was particularly vulnerable. And the way defendant carried out the crime indicated a plan to lure the victim to the location. (Rule 4.421(a)(1), (2), (3), (8).) All other factors in

aggravation set forth in the rule relating to the crime either did not apply or were neutral. The court also found that defendant engaged in violent conduct that indicates he is a serious danger to society, another factor that weighed heavily against striking the enhancement. (Rule 4.421(b)(1).)

Reviewing the factors in mitigation listed in rule 4.423, the trial court found that only one applied. Defendant has no prior record. (Rule 4.423(b)(1).) The court had already determined that another mitigating factor applied—defendant's age. (Rule 4.423(b)(6).)

After considering the totality of the circumstances, the trial court found it would not be in the interest of justice to exercise its discretion under section 1385 to strike the imposed enhancement or the sentence imposed for that enhancement.

The record demonstrates that in denying the motion to strike the enhancement, the trial court acted to achieve legitimate sentencing objectives, and its decision was not irrational or arbitrary.

B.    Defendant's arguments

Defendant contends the trial court abused its discretion in denying his request. He claims the court disregarded multiple mitigating factors, including his lack of a criminal history and evidence of immaturity and impulsivity when he committed the offense compared to his significant maturity since then. Defendant also claims the court relied on unproven assertions that he lured the victim to her death, lacked remorse, and lied in his testimony. He argues the totality of the court's reasoning demonstrates the court abused its discretion based upon the evidence. We review each of the challenged factors.

1.    Criminal history, youth, and immaturity

Defendant contends the trial court ignored the mitigating factors that he had no prior adult criminal record and that he was a juvenile when he committed the offense. The trial court did not ignore those factors. It specifically found that defendant had no

20

prior record and was a juvenile at the time of the offense. Nonetheless, the court concluded in its discretion that the factors in aggravation outweighed the mitigating factors, and it explained its reasoning. The record shows the court's reasoning was not irrational or arbitrary.

Defendant focuses on two reports submitted as part of his transfer hearing that indicated he had matured and accepted responsibility while in juvenile custody. One report, by defense psychiatrist Anne McBride, found that defendant's age and relative maturity at the time of the offense "contributed to his degree of criminal sophistication in general." As with adolescents as a whole, defendant's overall behaviors declined as he associated with a more negative peer group. He engaged in more risk-taking, focused on reward and undervalued risk, and his appreciation for the long-term consequences of his behaviors at the time was diminished.

But while incarcerated for nearly two years, defendant showed improvement in a rehabilitative setting, achieved mentor status, exhibited no violent behavior, displayed higher maturity and respect for authority, and scored greater than 99 percent on a treatment-amenability assessment. McBride concluded that defendant was amenable to rehabilitation within the juvenile justice system.

A second report, prepared by the juvenile court probation officer, recommended transfer to adult court. But it nonetheless stated that while in custody, defendant maintained a positive program, interacted well with others, participated in all programming, and earned his Leadership level in minimum time. He demonstrated self-improvement and personal growth, took advantage of all pro-social behavior modification programs that were offered, and earned his high school diploma.

Defendant argues these reports showed that he was extremely immature when he committed the offense, and the significant maturation progress he made while in custody shows just how immature he was at the time of the offense. But the court considered those reports as well as defendant's entire juvenile delinquency file when it considered

21

the motion to dismiss the enhancement. It nonetheless found that the factors in aggravation weighed heavily against the factors in mitigation, and the evidence in the record shows that the court's decision was not arbitrary or capricious.

### 2. Evidence of luring

Defendant contends the record does not support the trial court's statements that he lured the victim or made more than one attempt to lure the victim to a location where he could carry out the crime. We disagree.

In the Kik messages after the murder, Daay_Smacka asked defendant how he got the victim "to slide." Defendant replied, "Dayshawn." "Slide" referred to getting someone to come to you, to pick you up, or take you somewhere. Richard Kado testified that Dayshawn Barker had arranged for the victim, Kado, and Barker to meet up with defendant, Whiteside, Broughton, and others at McDonald's on the day of the shooting. The trial court could reasonably conclude from this evidence that defendant had lured the victim.

The evidence also supported the court's conclusion that defendant had lured the victim before. Evidence on defendant's cell phone indicated that he had tried to get the victim to give him and "Dan" a ride earlier that month. When the victim asked for money to give them a ride, defendant ended the conversation. The court did not rely on evidence outside the record to conclude defendant lured the victim.

### 3. Lack of remorse

Defendant contends the record does not support the trial court's finding that defendant showed no remorse. He relies on his trial testimony, where he stated he was shocked immediately after the shooting and lost for words because no one had told him the gun was loaded. Asked if he would do something different that night if he could, defendant said he would not have been there and would take back the whole night. Defendant testified it was hard to be in jail because every day, everybody thought he had

22

intentionally killed the victim and he had been charged with the crime when it was an accident.  Defendant said he cries about the incident because he took someone's life.  He also told the psychiatrist that he felt sorry for the victim's family, and if it was his sister or daughter, "it would be depressing."

The trial court, however, could look to other statements made by defendant and reasonably conclude he lacked remorse for the crime.  In the Kik messages, when Daay_Smacka said, "Bitch Macy got her shit drilled" and sent defendant five emoji faces with tears of joy, defendant responded, "I did it, bruh."  Defendant said he shot Murphy in the "[b]ack of the dome."  After Danny said Murphy's head had "smacked the fuck out the steering wheel," defendant responded with two emoji faces with tears of joy.  After defendant said they lured the victim through Dayshawn, he wrote, "We was playing it cool the whole night, though."  None of this evidence shows defendant exhibited remorse for the killing.

Defendant's phone conversations from the detention center showed he was concerned more with who had snitched than he was remorseful for the murder.  He was upset to learn from his sister that Barker and Whiteside were "rattin'."  A phone call with his brother centered on the possibility that Whiteside was going to testify.  At no time did defendant express remorse in these communications for the killing.  The trial court reasonably relied on this evidence to find that defendant lacked remorse for the crime.

4.    Defendant's testimony

Defendant challenges the trial court's finding that defendant lied when he testified the shooting was an accident.  He asserts the jury's rejection of the defense of accident did not establish, ipso facto, that he lied on the witness stand.  The prosecution did not call a firearms expert to rebut defendant's testimony that the gun discharged by accident.  The trial court, however, did not base its finding on the jury's rejection of accident.  It could reasonably base its finding on the numerous statements where defendant admitted

23

he intentionally killed the victim. And although there was no expert evidence disproving the shooting was an accident, there was eyewitness testimony that defendant shot the victim and his admissions that he did so intentionally. The trial court's finding was not irrational or arbitrary.

Defendant has not established that the trial court's decision not to dismiss the firearm enhancement was irrational or arbitrary. The evidence more than sufficiently establishes that the court's decision was well within the court's discretion.

III

*Appeal of Juvenile Transfer Order*

Effective January 1, 2022, an order transferring a minor from juvenile court to a court of criminal jurisdiction is subject to immediate appeal. (Welf. & Inst. Code, § 801, subd. (a); Stats. 2021, ch. 195, § 1; Assem. Bill 624.) The notice of appeal must be filed within 30 days of the challenged order. (Welf. & Inst. Code, § 801, subd. (a); Stats. 2021, ch. 195, § 1; Assem. Bill 624.) Defendant contends the new statute applies retroactively, and he asks us to remand the case to juvenile court to allow him to file a notice of appeal from the transfer order.

Assembly Bill 624 does not apply retroactively. (*People v. Pineda* (2022) 78 Cal.App.5th 491, 498.) As a result, only transfer orders entered on or after January 1, 2022, are appealable. Defendant was transferred to adult criminal court in 2018. Because he cannot appeal from his transfer order as a matter of law, we will not remand the case to juvenile court.

Defendant argues that not allowing him to file an appeal from his transfer order denies him due process. But a right to appeal is not a constitutional right if a full and fair trial on the merits is provided. (*Lindsey v. Normet* (1972) 405 U.S. 56, 77 [92 S.Ct. 862, 31 L.Ed.2d 36].) And the authority defendant relies on, *Kent v. United States* (1966) 383 U.S. 541, 566 [86 S.Ct. 1045, 16 L.Ed.2d 84], did not concern a right to appeal. It

24

held only that where a statutory scheme vests a juvenile court with authority to determine fitness and to waive its jurisdiction and transfer a matter to criminal court, the juvenile must be accorded due process protections when the court makes that decision. (*Id*. at pp. 561-563.) The right to appeal was not stated as one of those constitutional protections. (*Ibid*.)

Moreover, defendant cannot complain that he lacked an opportunity to challenge the juvenile court's determination. At the time of his transfer hearing in 2018, defendant could challenge the juvenile court's determination by filing a petition for writ relief in the Court of Appeal. (*People v. Pineda, supra*, 78 Cal.App.5th at p. 498.)

Because Assembly Bill 624 does not apply to defendant, we will not remand the matter to the juvenile court.

DISPOSITION

The judgment is affirmed.


 

 


                _____

                HULL, Acting P. J.


We concur:


_____

KRAUSE, J.


_____

BOULWARE EURIE, J.