Filed 1/16/26  P. v. Dean CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B335738 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA503211) |
| v. | |
| EDDIE DEAN, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising Deputy Attorney General, and Chelsea Zaragoza, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Eddie Dean, Jr., appeals from a judgment entered after a jury convicted him of the first degree murder of Stephawn Jouner and the attempted premeditated murder of H.J.[1] in a gang shooting. The jury also found true the firearm enhancement allegations on each count. On appeal, Dean contends the trial court erred in allowing a gang detail police officer to identify Dean as one of the shooters based on surveillance video of the shooting. He also argues substantial evidence did not establish Dean's involvement in the shooting. Dean further contends the gang evidence offered by the prosecution to show motive was cumulative and unduly prejudicial, and the trial court abused its discretion in admitting evidence of Dean's possession of a firearm and ammunition that were not linked to the shooting. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution Case*[2]

1. *The shooting*

At around 3:30 p.m. on January 8, 2021, H.J. and Jouner (H.J.'s best friend) were standing and talking on the sidewalk on East 75th Street near South Main Street in Los Angeles when six men began shooting at them. Jouner was killed. H.R. ran from the scene but sustained at least five gunshot wounds on his lower body. First responders found H.J. in a nearby alley and transported him to the hospital. H.J. testified that he did not see the shooters and did not know who shot him; he had very little recollection of the shooting.

---

[1]  H.J. was identified only by his initials at trial.

[2]  Dean was tried with codefendant Randy Walker. Walker was acquitted on all charges and is not a party to this appeal.

Los Angeles Police Department officers responded to the scene of the shooting between 3:30 and 4:00 p.m. on January 8 and found Jouner's dead body lying between two parked vehicles on 75th Street.  An autopsy showed that Jouner sustained 23 gunshot wounds over his whole body.  The forensic pathologist testified that at least four of the wounds were fatal, including bullet wounds that penetrated the skull, brain, heart, and lungs.

Los Angeles Police Department investigators recovered 62 spent shell casings from the scene, including thirty-two 9-millimeter casings, four .40-caliber casings, eleven .45-caliber casings, twelve 7.62-millimeter casings, and three casings of unknown caliber stamped "WMA."  Two unfired .40-caliber bullets were also recovered.  Los Angeles Police Detective Patrick Farmer testified that the varying calibers meant at least four different guns had been fired.

2.    *The surveillance videos*

Los Angeles Police Officer Thorsten Timmermans collected surveillance video from four cameras mounted on a business at the southeast corner of Main and 75th Streets.  Collectively, the videos captured nearly the entire shooting from multiple perspectives, with some blind spots.  Excerpts of the video played for the jury showed that at about 3:23 p.m.[3] on January 8, Jouner and H.J. were standing together on 75th Street, socializing and smoking.  At about 3:24 p.m., a white, four-door sedan followed by a black, four-door sedan traveled north on Main Street past

---

[3]    Officer Timmerman and other investigators synchronized the time stamps in the surveillance videos to standard time, but their calculations may have deviated from standard time by up to a minute.

3

75th Street.  After passing the intersection, both vehicles pulled over for about 10 seconds, then continued driving.

Five minutes later, at about 3:29 p.m., the white car returned and pulled to the curb at the northeast corner of the intersection, and three men jumped out of the passenger side of the car.  Each man wore a dark hooded sweatshirt that obscured his face and blue gloves.  Immediately upon exiting the car, each man raised his arms and began to repeatedly fire a handgun in the direction of H.J. and Jouner.  Two seconds later, the black car pulled up to the southeast corner of the intersection, and three more men emerged and began to fire handguns in the direction of H.J. and Jouner.  Two of the men wore hooded sweatshirts, and a surgical face mask is visible on one.  The third man who exited the black car, later identified as Dean, wore a beanie-style hat and a gray hooded sweatshirt, and he had a beard.  His face can be seen in the videos.

When the shooting began, H.J. and Jouner quickly dodged between two parked cars, and then H.J. ran away from the shooters and out of the frame.  Four of the shooters ran partway down 75th Street while continuing to fire their guns, and Jouner's body fell to the street.  Dean did not run down 75th Street with the others; rather, he remained at the southeast corner of the intersection, and it appears from his gun's recoil and muzzle smoke that he fired at least 12 shots in the direction of H.J. and Jouner.  Twenty seconds after the shooting began, all six shooters returned to the two vehicles, which drove north on Main Street.

Police investigators also obtained surveillance video footage from a building on the 7400 block of South Main Street.  Excerpts from the video played for the jury show that about five minutes before the shooting, the white and black cars turned from

4

northbound Main Street onto 74th Street, where they were slowed by traffic. As described by Los Angeles Police Detective Jocelyn Harris, the black car appeared to have a red-and-white paper-like rear license plate, similar to a temporary tag from a car dealership. Immediately after the shooting, both vehicles passed the camera as they traveled rapidly north on Main Street.

### 3. *Dean's identification and arrest*

For three months after the shooting, the police investigators were unable to identify any suspects. In April 2021 Detective Harris took over the case as the investigating officer. She learned that H.J. was a member of the 7-Tray (or 73) Crips criminal street gang, and the shooting occurred in an area that was 7-Tray Crips territory under challenge from the rival Swan Bloods criminal street gang. Detective Harris contacted Mitchell Woods, a gang enforcement detail officer for the Los Angeles Police Department southeast division and an expert on the Swan Bloods gang, hoping he could make an identification. Officer Woods viewed the surveillance video and "immediately" identified Dean as the bearded shooter on the southeast corner who exited the black car. Based on this identification, Detective Harris obtained search warrants to search Dean's social media account and cell phone records. Dean was arrested on February 17, 2022. During a search of Dean's residence, police officers found 177 live rounds of ammunition of varying calibers, including several dozen .40-caliber and .22-caliber rounds, a smaller number of 5.56-millimeter and .20-caliber rounds, one unknown-caliber round stamped "WMA," and a Glock cartridge loaded with ten .40-caliber rounds from two manufacturers. No firearms were found, nor did the police recover any of the clothing seen in the surveillance video.

5

At trial, Officer Woods testified about his identification from the surveillance video.[4] He explained that as part of his assignment to the gang enforcement detail, he had interacted with Dean approximately 100 times, nearly every week for more than four years. The interactions ranged from simple greetings to 10-minute conversations. Officer Woods knew Dean was a member of the Swan Bloods gang, but Officer Woods had never arrested him, and their interactions were "positive" and "friendly." When Detective Harris approached Officer Woods about making an identification, he had not been told anything about the investigation.

Officer Woods reviewed the surveillance video entered as People's exhibit 91 (in which Dean was most visible) and six still frames from the video that were also shown to the jury. Referring to the still frames, Officer Woods explained, "[Dean] has very unique physical features. He has this red beard that is like a chin-strap cap. He often wears glasses, and he has a unique walk or gait. . . . [Previously] he was the victim of a shooting. He was hit in both his legs, and since then, he's kind of braced himself when he walks just to account for the injury, and I observed that in this video." Further, Officer Woods explained, in the video of the shooting, Dean appeared to "step[] gingerly," shifting more weight onto his left leg than his right and lowering his left arm. Officer Woods also observed a red beard that he described as "like a chin-strap cap," and he "believe[d]" he saw glare from eyeglasses on Dean's face. Officer Woods added, "[I]t's not one thing that causes me to believe that this is Eddie Dean. It's the totality of everything that I know about Eddie in my opinion."

---

[4]     Officer Woods also identified Dean in the courtroom.

Los Angeles Police Officer Steven Alaniz, who was Officer Woods's partner in the gang enforcement detail for the southeast division, also identified Dean as the bearded shooter. Like Officer Woods, Officer Alaniz had numerous contacts with Dean over several years, interacting nearly every week, sometimes conversing for 20 or 30 minutes. Officer Alaniz and Dean developed a "very friendly" relationship. When Officer Woods was unavailable to testify at the preliminary hearing, Detective Harris approached Officer Alaniz and asked if he could identify anyone in a surveillance video. Officer Alaniz immediately recognized Dean in the video from the moment Dean climbed out of the black car.

Officer Alaniz explained that Dean had "unique physical attributes" that were unlike any other Black man with whom he had interacted in his job. Dean was "particularly light-skinned, and he has a beard that glows red in the light." The beard was usually kept short and thick. Dean almost always wore glasses during their prior interactions. Officer Alaniz observed that Dean's gait changed after he had been shot, and Dean would "brace[] his leg as he makes like exaggerated motions with his body" when starting or stopping walking, or when changing directions.

The prosecutor played the same surveillance video she had shown to Officer Woods, and Officer Alaniz confirmed this was the video he had first watched with Detective Harris and the prosecutor before the preliminary hearing. Officer Alaniz testified that when he first watched the video, he "immediately recognized that to be Eddie Dean." Officer Alaniz explained that he had seen Dean on many occasions and in many contexts, "from several streets away, to up close and personal, to sitting in a car, wearing masks due to COVID," and "in every situation I

7

recognized him immediately." In an unrelated earlier incident (in which Dean was a witness, not a suspect), Officer Alaniz identified Dean from surveillance video that was not high quality. With respect to the surveillance video from the shooting, Officer Alaniz was able to see Dean's beard and glasses, but what "jumped out" was Dean's demeanor and gait and how Dean "braced his leg as he was turning around, as I know Eddie to do."

4. *The gang evidence*

Officer Alaniz testified that Dean was a self-admitted member of the 89 Family Swans, a set of the Swan Bloods gang. The Swan Bloods have about 300 members and include sets based around 77th, 79th, 80th, 84th, 89th, and 92nd Streets that cooperate with each other in committing crimes. The Swan Bloods are rivals with "almost every Crip gang," including the 7-Tray Crips. The location of the shooting—75th and Main Streets—was claimed by the 7-Trays but was a "controversial jurisdiction" that was "intertwined partially" with nearby Swans gangs. The Swans and 7-Trays would "fight over that area" and, in Officer Alaniz's experience, when rivals "see each other on that street" in a disputed area, "it could escalate from . . . an exchange of words to homicide."

Officer Alaniz testified the criteria used to determine whether someone is a gang member—in addition to a self-admission—included whether the person wore gang clothing, had gang tattoos, frequented the gang's territory, displayed gang colors, and hung out with gang members. The prosecutor showed Officer Alaniz nine photographs retrieved from Dean's social media account. Officer Alaniz explained how the photographs showed Dean and his associates making different signs of the Family Swans and their sets, wearing gang colors and clothing,

8

and associating with known Family Swan gang members. For example, in one photograph, Dean made a hand sign referencing the 80 Swans that he captioned "7892," a reference to the Family Swans' territory between 78th and 92nd Streets. In another image, Dean made a Swans gang sign and wrote, "892 I took an oath for the gang. It ain't no changing that." Another photograph with Dean and a companion making gang signs was captioned, "Only the family" with a swan picture. Dean also posted a photograph of his neck tattoo with an inverted San Francisco Giants logo, an image adopted by the Family Swans to represent the "S" and "F" in the gang's name read backwards. The photograph was captioned, "Family Swan on my neck. That really mean something."

The prosecutor also introduced a photograph from Dean's social media account that showed him sitting on a lawn chair while holding a handgun with an extended magazine pointed at the camera. The photograph was captioned with Dean's social media username and a swan emoji.[5]

5. *The cell phone evidence*

Federal Bureau of Investigation special agent Jeff Bennett analyzed Dean's cell phone records and cell tower data to track the location of Dean's phone on the day of the shooting. Agent Bennett concluded that between 2:38 and 3:18 p.m. on January 8, Dean's phone moved from Compton (where Dean resided) to the vicinity of the shooting and an hour later, at 4:20 p.m., the phone traveled back toward Compton. At 3:24 p.m.—when the black car

---

[5] The prosecutor introduced four more non-gang-related photographs of Dean from his social media account through Detective Harris, who discussed Dean's beard and eyeglasses.

first passed the intersection of 75th and Main Streets—Dean's phone connected with a tower about 10 blocks south of the shooting, even though there were two closer cell towers to the north. Agent Bennett admitted on cross-examination that if Dean's phone were in the black car at 3:24 p.m. (the time stamp on the surveillance video), Agent Bennett would have expected the phone to connect to one of the closer towers.

Detective Harris testified that the day before the shooting, someone with the username "es_gunna" sent Dean a direct message on social media stating, "Don't forget to take off that paper plate." Dean responded, "Yup." Officer Alaniz testified that a Family Swans member, Sylvonte Leverette, used the moniker "Gunna." Leverette appeared with Dean in three of the social media photographs admitted at trial, and in one of the photographs, Leverette was tagged "@es_gunna." Dean and Leverette also communicated on the night of the shooting about meeting up; however, Dean never discussed the shooting in any social media messages in the records Detective Harris reviewed.

B.    *The Defense Case*

Stephen Buller, an analyst specializing in forensic video enhancement, was retained by the defense to "enhance, clarify, and enlarge" the surveillance videos from two of the cameras and to extract clear still images from the videos. Buller testified there "wasn't a whole lot of room for enhancement" of the motion video due to the quality of the original, but he applied software filters that increased contrast and overall lightness. The enhanced video, as well as a frame depicting the shooter identified as Dean with his gun lowered to his torso, were shown to the jury. On cross-examination, Buller admitted that applying

10

filters for contrast had the effect of making objects "a little bit darker."

Dean's stepfather, Teron Shaw, testified that Dean was not the shooter in the surveillance video. The enhanced video and still frames prepared by Buller were played for Shaw, who explained to the jury that the shooter moved in a way that Dean was incapable of doing due to the gunshot injuries he had previously sustained in both legs and his right elbow. In particular, when the shooter first appeared in the frame of the enhanced video, the shooter appeared to do an athletic "jump stop" before firing his gun: "[H]e's running up. Now he did a little jump . . . and now he's like sticking the landing and getting ready to start shooting." The shooter also used both hands to fire his gun with his elbows "locked in," but Dean suffered numbness in his right arm and was unable to grip properly. Shaw did not believe Dean would be physically able to hold and fire a gun in the manner of the shooter. Shaw conceded that Dean had a "reddish-orange beard" that was uncommon in Black men and "stands out," but Shaw did not see any red in the shooter's beard in the video. Contrary to Officer Woods's and Officer Alaniz's testimony, Shaw did not see eyeglasses on the shooter. Shaw also stated, contrary to the officers' testimony, the shooter was not bracing his leg; instead, it appeared the shooter was "grabbing at his crotch area." Shaw was "100 percent certain" the shooter was not Dean.

On cross-examination, Shaw testified he was not aware that the contrast in the enhanced video had been increased in a manner that could make objects such as the shooter's beard darker. However, upon viewing the original, unenhanced video, Shaw maintained that the shooter did not have a red beard or eyeglasses. With respect to his testimony that Dean would be

11

unable to grip a gun because of his injured right arm, Shaw testified he had never seen Dean handling a gun until he saw social media photograph of Dean holding a semiautomatic handgun introduced by the prosecutor at an earlier proceeding.

Forensic analysis Robert Aguerro examined Dean's cell phone and cell tower data and testified that at 3:24 p.m. on the day of the shooting, Dean's phone connected to a tower that was farther from the scene than four other towers. Moreover, Dean's phone connected to the same tower at 3:18 p.m., which was south of the shooting, and this would have been unlikely to occur if Dean's phone was inside the black car shown on the surveillance videos moving north of the crime scene. Aguero confirmed Dean's call and text records did not show any contacts between Dean and his codefendant.

C.    *The Verdict and Sentence*

The jury found Dean guilty of first degree murder (Penal Code,[6] § 187, subd. (a); count 1) and attempted willful, deliberate, and premeditated murder (§§ 187, subd. (a), 664; count 2). As to count 1, the jury found true the allegation Dean personally used a firearm in the commission of murder (§ 12022.5, subd. (a)), and as to count 2, the jury found Dean personally used a firearm (§ 12022.5, subd. (a)) and inflicted great bodily injury on H.J. (§ 12022.7, subd (a)).

The trial court sentenced Dean to an aggregate state prison term of life, plus 36 years to life. The court imposed a term of 25 years to life on count 1 for murder, plus the middle term of four years for the firearm use enhancement. On count 2 for

---

[6]    Further undesignated statutory references are to the Penal Code.

12

attempted premeditated murder, the court imposed a life term, plus the middle term of four years for the firearm use enhancement and three years for the great bodily injury enhancement.

Dean timely appealed.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Allowing Officer Alaniz To Identify Dean in the Videos*

Dean contends the trial court erred in allowing Officer Alaniz to identify Dean as the bearded shooter in the surveillance videos because the officer's testimony was improper opinion testimony, and the jury in viewing the video was "as capable as Alaniz to determine whether [Dean] was one of the shooters." The court did not abuse its discretion.

A nonexpert witness may offer opinion testimony if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of [the witness's] testimony." (Evid. Code, § 800.) "'[T]he identity of a person is a proper subject of nonexpert opinion,'" and appellate courts have "long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*); see *People v. Mixon* (1982) 129 Cal.App.3d 118, 130-131 (*Mixon*) [officers' identifications of defendant from surveillance photograph was proper where they had "ample prior contact" with defendant, they "identified him unequivocally and without hesitation," and the identification aided the jury, because "the surveillance photograph was not a clear depiction of the subject, and [defendant] had changed his appearance before trial"]; *People v. Perry* (1976) 60 Cal.App.3d

13

608, 613 (*Perry*) [police officers' identifications from surveillance video were proper because they were based on officers' "contacts with the defendant, their awareness of physical characteristics on the day of the robbery, and their perception of the film taken of the events"].)[7]

Courts have generally considered "two predicates for the admissibility of lay opinion testimony as to the identity of persons depicted in surveillance [video]: (1) that the witness testify from personal knowledge of the defendant's appearance at or before the time the [video] was taken; and (2) that the testimony aid the trier of fact in determining the crucial identity issue." (*Mixon, supra*, 129 Cal.App.3d at p. 128.) The Supreme Court in *Leon* extended the holdings in *Mixon* and *Perry*, concluding a police officer need not be familiar with the defendant prior to the crime to make an identification from surveillance video; rather, "[q]uestions about the extent of [the detective's] familiarity with defendant's appearance went to the weight, not the admissibility, of [the detective's] testimony." (*Leon, supra*, 61 Cal.4th at pp. 600-601.) We review a trial

---

[7] We reject the People's contention Dean forfeited his objection to Officer Alaniz's identification testimony by failing to object at trial. At the Evidence Code section 402 hearing, the trial court denied the motion by Dean's codefendant (Randy Walker) to preclude Detective Harris from identifying Walker in the surveillance video, which Walker had argued was improper opinion testimony under *Leon, supra*, 61 Cal.4th 579. We decline to find forfeiture because Dean's attorney may have concluded an objection would have been futile given the court's rejection of the same argument made by Walker. *(People v. Johnsen* (2021) 10 Cal.5th 1116, 1164 ["failure to object would not forfeit [defendant's] claim when doing so would have been futile"].)

court's decision to admit a lay identification opinion for abuse of discretion.  (*Id.* at p. 600; accord, *Mixon*, at p. 127.)

Dean contends Officer Alaniz's opinion was not helpful to the jury because the jurors could have drawn their own conclusions whether Dean was the shooter from watching the videos and seeing Dean in court and in photographs admitted into evidence, in contrast to *Perry, supra*, 60 Cal.App.3d at page 613 (as well as in *Leon, supra*, 61 Cal.4th at page 601 and *Mixon, supra*, 129 Cal.App.3d at page 125), in which the defendants changed their appearances before trial.  However, the courts in *Perry*, *Leon*, and *Mixon* did not hold, nor is there any authority for the proposition, that identification testimony is admissible *only* where the defendant changes his appearance.

Moreover, Officer Alaniz had information from his extensive interactions with Dean that would not have been apparent from observing Dean in court, including his familiarity with Dean's gait and distinctive movement patterns.  Based on this experience, Officer Alaniz was far better equipped than the jurors to recognize Dean in the videos, which had poor resolution and showed Dean in motion at a distance.  As Officer Alaniz explained, he recognized Dean the moment Dean emerged from the black car, and what "jumped out" was Dean's demeanor, gait, and how he "braced his leg as he was turning around, as [he knew] Eddie to do."  (See *People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067 [loss prevention officer was properly allowed to identify defendant in a surveillance video because the officer had watched 20 to 30 other videos showing the defendant, "during which time [the officer] could observe such distinguishing characteristics as defendant's posture, gait and body movements"].)

B. *Substantial Evidence Supported a Finding Dean Was One of the Shooters*

Dean contends there was insufficient evidence to support his conviction because no physical evidence connected him to the shooting, and the identifications by Officers Woods and Alaniz were unreliable. There was substantial evidence.

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cardenas* (2025) 18 Cal.5th 797, 821; accord, *People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "'"'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'"'" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 627; accord, *People v. Frias* (2024) 98 Cal.App.5th 999, 1015.) "'"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence."'" (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *Frias*, at p. 1015; see *People v. Westerfield* (2019) 6 Cal.5th 632, 713 ["If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."].)

Officers Woods and Alaniz both testified they "immediately" recognized Dean as the bearded shooter when they

first viewed the video marked as People's exhibit 91. As discussed, both officers had extensive interactions with Dean over several years, and they were familiar with his distinctive appearance, demeanor, and pattern of movement after his shooting injury. Both officers described to the jury with specificity what they perceived as they watched the video that made it clear to them Dean was the shooter, and the video is substantially consistent with their observations. The video has poor resolution, but it is apparent in viewing the video that the shooter had a "short and thick" chin-strap beard, was wearing eyeglasses (as seen in People's exhibit 91 at timestamp 04:29:16 that shows the glare from the glasses), and had a distinctive gait. Further, as the prosecutor noted in her closing argument, unlike the other shooters, Dean did not run after the victims, suggesting a physical limitation. Although it is difficult to discern from the video whether the shooter's beard was red or reddish, the jurors were able to watch the video and make a determination whether they found credible the officers' descriptions of the beard.

Dean focuses his argument on the circumstances surrounding the officers' initial identifications of Dean. With respect to Officer Woods, Dean questions whether Officer Woods was the officer who made the initial identification, pointing to Detective Harris's testimony at the preliminary hearing that when she first showed the video to Officer Woods, "[h]e then took the video back to his station and showed the other gang experts the video to see if they identified anyone on that surveillance video." However, Detective Harris at trial testified that Officer Woods made the initial identification upon first viewing the video in her office. And Officer Woods consistently testified, when cross-examined by defense counsel, that he recognized Dean the first time he viewed the video.

Defense counsel also asked Officer Alaniz about Detective Harris's preliminary hearing testimony in which she answered affirmatively to defense counsel's inquiry whether, at the time of Officer Alaniz's initial identification, he "already knew . . . that the person that [he] was going to be asked to testify against was Eddie Dean." Officer Alaniz disagreed with Detective Harris's characterization, stating he knew only that he was being asked to make an identification in a case in which Dean was a defendant. As discussed, it was for the jury to evaluate which testimony it found more credible, not for this court to decide on appeal. (See *People v. Beck and Cruz, supra*, 8 Cal.5th at p. 627.)

There was significant other evidence that Dean was involved in the shooting. The day before the shooting, Dean's fellow gang member Leverette sent a message to Dean: "Don't forget to take off that paper plate." Surveillance video from five minutes before the shooting showed the black car had instead of a rear license plate what appeared to be a printed paper license plate. In addition, the cell tower analysis showed that Dean's cell phone moved from his residence in Compton to the vicinity of the shooting—connecting to a tower 10 blocks from the shooting—in the hour before the shooting, and his cell phone returned to Compton in the hour after the shooting. Although special agent Bennett conceded the evidence that Dean's phone was at the crime scene at the time of the shooting was equivocal because there were two closer towers with which the phone did not connect, the jury could have inferred Dean did not have his phone on his person while he was carrying out the shooting.

The People also introduced Dean's social media posts that showed he was an active and committed member of the Family Swans who associated with and supported Swan sets that claimed territory near the scene of the shooting. This evidence

showed Dean's motive and intent in carrying out the shooting against rival gang members. The evidence the shooting was gang-related was compelling: Officer Alaniz testified that the intersection of 75th and Main Streets was at the heart of a territorial dispute between the Swans and the 7-Tray Crips (in which H.J. was a member), and the presence of rival gang members loitering on the disputed street could have escalated to murder. Further, the surveillance video showed a coordinated and premeditated attack involving six gloved gunman in two cars who fired at least 62 bullets at a known 7-Tray Crips gang member.

C.    *The Trial Court Did Not Abuse Its Discretion in Admitting Gang Evidence from Dean's Social Media Account*
       1.    *The trial court proceeding*
The prosecutor filed a motion in limine to introduce gang evidence to show motive, intent, and identity. Dean filed a motion in limine to exclude, in relevant part, the "[u]se of gang pictures or videos," noting Dean and his codefendant were not charged with any gang crimes or enhancements. At the Evidence Code section 402 hearing on both motions, the prosecutor stated her intent to introduce photographs from Dean's social media account "of his gang tattoo, him throwing gang signs, him associated with known gang members," and to present testimony from gang officers about Dean's membership in the Swan Bloods and the gang's rivalry with the 7-Tray Crips. The prosecutor agreed not to use a gang hypothetical, introduce evidence of predicate offenses, or present testimony the shooting was for the benefit of a criminal street gang. The trial court ruled the proposed evidence was admissible and not overly prejudicial.

19

2. *Governing law*

"Although evidence of gang membership carries the potential for prejudice, it "'is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.'"'" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 772; accord, *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [gang evidence "is admissible even when a gang enhancement is not charged, provided the probative value of the evidence is not substantially outweighed by its prejudicial effect"]; *People v. Chhoun* (2021) 11 Cal.5th 1, 31 ["The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense."].) However, "'courts should carefully scrutinize evidence of a defendant's gang membership because such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged."'" (*Chhoun*, at p. 31; accord, *People v. Melendez* (2016) 2 Cal.5th 1, 28-29.)

Even where evidence is relevant, under Evidence Code section 352 the trial court "'in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.) "'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is

not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . "[It] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues."'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *Bell*, at p. 105.)

We review a trial court's ruling on the admissibility of gang evidence, including whether the evidence was unduly prejudicial, for an abuse of discretion. (*People v. Ramirez, supra*, 13 Cal.5th at p. 1095; see *People v. Chhoun, supra*, 11 Cal.5th at p. 33 ["'"The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason."'"].)

3. *Dean's social media photographs were highly relevant to prove the charged offenses and not unduly prejudicial*

Dean contends the trial court abused its discretion in allowing the prosecution to introduce 14 gang-related photographs to establish his alleged motive for the shooting. He argues his motive to commit the shooting was established by the officers' undisputed testimony that Dean was a self-admitted member of the Family Swans, coupled with the officers' testimony about the gang and its deadly territorial rivalry. Thus, Dean argues, there was no need to introduce the photographs to show he was a Swan member, and the photographs were cumulative and highly prejudicial. We are not persuaded.

As discussed, Officer Alaniz testified about nine of Dean's social media photographs, identifying the gang signs, colors, clothing, and gang members in the photographs. Detective Harris testified about five additional photographs, including a

21

photograph (which we address separately) of Dean holding a handgun captioned with a swan emoji. The images showed that Dean not only self-identified as a member of the Family Swans, but he was deeply committed to and involved in the gang. He captioned one photograph with a companion making gang signs, "892 I took an oath for the gang. It ain't no changing that." Another photograph with Dean and a companion making gang signs was captioned, "Only the family" with a swan picture. Dean was proud to demonstrate his allegiance, posting a photograph of his neck tattoo with the caption, "family Swan on my neck. That really means something." Several of the photographs included references to different Swan sets and showed Dean socializing with prominent Swan gang members. This evidence was relevant to show Dean's motive to carry out a territorial gang shooting with other Swan gang members to kill rival gang members.

Many of the photographs were also relevant to Dean's appearance around the time of the shooting. Four of the photographs were not connected to his gang membership and were instead relied on by the officers to discuss the styling of Dean's beard and the eyeglasses he wore. Three photographs showed Dean with Leverette and were offered to show Leverette was a committed Family Swan gang member and that Leverette's message to Dean the day before the shooting to remove the paper plate evidenced Dean's involvement in planning the crime.

Relying primarily on *People v. Cardenas* (1982) 31 Cal.3d 897, Dean argues the multiple gang photographs were cumulative and unduly prejudicial because they created a risk the jury would infer Dean had a "criminal disposition." *Cardenas* is distinguishable. In that case, eyewitnesses to a convenience store robbery that resulted in the store manager's murder gave

"sharply conflicting" testimony about the identification of Cardenas as the perpetrator, and the defense presented several alibi witnesses. (*Id.* at pp. 901-903.) The prosecutor attacked the credibility of the alibi witnesses by eliciting admissions that they and Cardenas were all members of the same gang, and the prosecutor asked numerous questions about their gang affiliation and gang practices. (*Id.* at pp. 903-905.) The Supreme Court reversed Cardenas's conviction, holding the gang-related evidence was unduly prejudicial and cumulative under Evidence Code section 352 because it was offered only to show the alibi witnesses' bias, and other evidence already showed the witnesses' ties with Cardenas; further, the prosecutor suggested in his questioning that the robbery could be gang-related, creating a "near certainty that the jury viewed [Cardenas] as more likely to have committed the violent offenses charged against him because of his membership in the Flores gang." (*Id.* at pp. 905-906.)

Here, as discussed, the photographic evidence came from Dean's own social media account and was relevant to prove crimes that were indisputably gang-related. Moreover, although the gang officers testified that Dean was a self-admitted Family Swan, the photographic evidence was not cumulative because it was introduced for multiple purposes other than Dean's gang affiliation.

D. *The Trial Court Abused Its Discretion in Admitting Evidence of Ammunition Found in Dean's Home But Not the Gun Photograph; the Error Was Harmless*

Dean contends the trial court erred in admitting evidence of the ammunition found during the search of his home and the social media photograph of him holding a semiautomatic handgun (the gun photograph) because they were irrelevant and

highly prejudicial under Evidence Code section 352. Dean's contention has merit as to the ammunition but not the gun photograph. However, the error was harmless.

      1.     *The gun photograph*

At the pretrial hearing on the admission of evidence, the prosecutor acknowledged as to the gun photograph that she would not be able to prove the handgun in the photograph was the murder weapon. However, she stated it "could be" the murder weapon. On the first day of trial, the trial court ruled the prosecutor could use the gun photograph based on the prosecutor's confirmation that the gun "is of the type that could have been used based on the evidence at the crime scene." Detective Harris opined at trial that in the gun photograph Dean was holding what appeared to be a semi-automatic gun that could use 9-millimeter, .40- or .45-caliber bullets (for which casings were found at the scene), but she could not say with certainty what caliber bullet the gun could use.

The trial court did not abuse its discretion in admitting the gun photograph. Dean is correct that "[w]hen the prosecution relies . . . on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons." (*People v. Riser* (1956) 47 Cal.2d 566, 577, overruled on other grounds by *People v. Morse* (1964) 60 Cal.2d 631; accord, *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056.) However, "[w]hen the specific type of weapon used to commit a homicide is *not* known, it may be permissible to admit into evidence weapons found in the defendant's possession . . . that could have been the weapons employed. There need be no conclusive demonstration

24

that the weapon in defendant's possession was the murder weapon." (*Riser*, at p. 577, italics added [.38 bullet shells found in defendant's car were admissible where resembled .38 bullets found at scene and could have come from murder weapon; .22 bullet shells and Colt weapon not admissible where excluded as murder weapon or bullets from murder weapon]; see *People v. Neely* (1993) 6 Cal.4th 877, 896 ["the weapon and the ammunition located in defendant's truck were found by deputy sheriffs at the crime scene, shortly after commission of the crimes, and there was no direct evidence as to the fatal shooting that would render this evidence irrelevant to establish facts material to proof of the charged offenses"].)

In this case, the bullet casings found at the crime scene were of four different calibers, but none of the weapons was recovered. Because the gun in the photograph could have been used by Dean in the shooting (that is, it could hold 9-millimeter, .40-caliber, or .45-caliber bullets), the photograph was not inadmissible under *Riser*.

Moreover, the gun photograph, captioned with a swan emoji, was relevant as gang evidence, which as discussed, was probative of identity, motive, and intent. (See *People v. Cox* (2003) 30 Cal.4th 916, 956 ["when weapons are otherwise relevant to the crime's commission, but are not the actual murder weapon, they may still be admissible"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The probative value of the gun photograph outweighed any undue prejudice from the inference Dean was a violent person (in showing he had access to a gun), and the trial court did not abuse its discretion in admitting the gun photograph.

### 2. *The ammunition found in Dean's home*

We agree with Dean that the trial court abused its discretion in admitting evidence of the significant amount of ammunition found in his home. There was no evidence to match this ammunition to the type of shell casings found at the crime scene,[8] and the search of Dean's home occurred more than a year after the shooting. The ammunition was therefore not relevant to prove that Dean was one of the shooters. Further, the prosecutor's suggestion in her closing argument that the stockpile of ammunition meant Dean must have had "matching weapons" (absent any evidence) asked the jury to draw an improper and prejudicial inference "that he is the sort of person who carries deadly weapons." (*People v. Riser, supra*, 47 Cal.2d at p. 577; accord, *People v. Barnwell, supra,* 41 Cal.4th at p. 1056.)

Although admission of the ammunition evidence was error, the error was harmless. "[T]he application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard" of *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 373-374 [applying *Watson* to alleged error under Evid. Code, § 352 in admitting cumulative and inflammatory photographs].) "'Under the *Watson* standard, the erroneous admission of [unduly

---

[8] Although some of the ammunition was of the same caliber as shell casings found at the crime scene, there was no expert testimony tying the bullets in Dean's home to the specific type of shell casings found in the parking lot. The Attorney General does not contend the similarity of the caliber of bullets supported admission of the evidence.

26

prejudicial evidence] warrants reversal of a conviction only if the appellate court concludes that it is reasonably probable the jury would have reached a different result had the photograph been excluded.'" (*Thomas,* at p. 374.)

There is no reasonable probability the jury would have found Dean not guilty had the ammunition evidence been excluded. Counsel for both parties made clear during their opening statements and closing arguments that the central issue was identification. The jury watched the video footage of the shooting, and it was undisputed that this was a violent murder of a rival gang member. In finding Dean guilty, the jury necessarily believed the identification testimony, thus finding it was Dean who stood on a street corner in broad daylight and fired at least 12 shots in rapid succession from a semiautomatic handgun at H.J. and Jouner. It is not reasonably probable had the jury not found the identification testimony credible that the jury would have convicted Dean on the basis he was a violent man who stored ammunition in his home, especially in light of the fact no evidence was presented tying the ammunition to the shooting.

## DISPOSITION

The judgment is affirmed.


                                             FEUER, J.

We concur:


MARTINEZ, P. J.


STONE, J.